**I–291 WHY? ASSOCIATION, on behalf of itself and its members**

v.

**Joseph B. BURNS, as Connecticut Commissioner of Transportation, et al.**

Civ. No. H–229.

United States District Court, D. Connecticut.

Feb. 7, 1974.

226

Haynes N. Johnson, and Alphonse R. Noë, Stamford, Conn., for plaintiff.

Robert K. Killian, Atty. Gen., Clement J. Kichuk, Asst. Atty. Gen., Samuel Kanell, Special Asst. Atty. Gen., Stewart H. Jones, U. S. Atty., Henry S. Cohn,

Asst. U. S. Atty., Hartford, Clifford R. Oviatt, Jr., Bridgeport, Conn., Andrew S. Aharonian, New Britain, Conn., for defendants.

## RULING ON MOTION FOR PRELIMINARY INJUNCTION

### BLUMENFELD, Chief Judge.

Plaintiff is an unincorporated association of persons aggrieved by present plans for the construction of the southwest quadrant of I–291, a multilane, controlled access, divided highway which would run for about 7.6 miles through Rocky Hill, Wethersfield, Newington, New Britain, and Farmington, Connecticut, linking I–91 south of Hartford, Connecticut, with I–84 west of Hartford. This quadrant was originally planned as only part of an entire circumferential beltway around metropolitan Hartford. The southwest quadrant (Rocky Hill to Farmington) of this beltway is the only portion thereof which is nearing construction, and is the only portion thereof which is directly in issue in this action. For convenience I will refer hereinafter to this southwest quadrant by its family name, "I–291."

Plaintiff, whose standing to bring this action has not been challenged, has filed a complaint seeking injunctive and declaratory relief. Plaintiff asserts that this Court has jurisdiction over the action under 28 U.S.C. §§ 1331, 1337, 1361, 1391, 2201 and 2202. Alleged as separate causes of action are defendants'[1] breach of four federal statutes.[2] In moving for a preliminary injunction to halt construction of I–291, plaintiff has by agreement with defendants restricted its attack to its first cause of action: defendants' alleged breach of the duties imposed on them by the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. § 4331 et seq.[3] Plaintiff enu-

---

1. The five defendants are the Connecticut Commissioner of Transportation, his Deputy Commissioner in charge of the Connecticut Bureau of Highways, the Division Engineer for Connecticut, the Northeastern Regional Administrator of the Federal Highway Administration, and the Secretary of the United States Department of Transportation.

2. The four allegedly violated statutes are the National Environmental Policy Act, as amended, 42 U.S.C. § 4331 et seq.; the Intergovernmental Cooperation Act, as amended, 42 U.S.C. § 4231 et seq.; The Clean Air Act, as amended, 42 U.S.C. § 1857 et seq.; and section 4(f) of the Department of Transportation Act of 1966, 49 U.S.C. § 1653(f).

3. Section 101 of NEPA, 42 U.S.C. § 4331, provides in pertinent part:

 "(a) The Congress, recognizing the profound impact of man's activity on the interrelations of all components of the natural environment, particularly the profound influences of population growth, high-density urbanization, industrial expansion, resource exploitation, and new and expanding technological advances and recognizing further the critical importance of restoring and maintaining environmental quality to the overall welfare and development of man, declares that it is the continuing policy of the Federal Government, in cooperation with State and local governments, and other concerned public and private organizations, to use all practicable means and measures, including financial and technical assistance, in a manner calculated to foster and promote the general welfare, to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans.

 (b) In order to carry out the policy set forth in this chapter, it is the continuing responsibility of the Federal Government to use all practicable means, consistent with other essential considerations of national policy, to improve and coordinate Federal plans, functions, programs, and resources to the end that the Nation may—

 (1) fulfill the responsibilities of each generation as trustee of the environment for succeeding generations;

 (2) assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings;

 (3) attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences;

 (4) preserve important historic, cultural, and natural aspects of our national heritage, and maintain, wherever possible, an environment which supports diversity and variety of individual choice;

 (5) achieve a balance between population and resource use which will permit

merates in five counts defendants' alleged failure to comply with NEPA, four of the five counts touching directly or indirectly on the adequacy of the Environmental Impact Statement (EIS) on I–291 prepared by defendants. The first count alleges that the air pollution and noise generated by I–291, as indicated by defendants' own studies made after completion of the EIS, will be so great as to violate the substantive mandate of section 101(b)(3) of NEPA, 42 U.S.C. § 4331(b)(3), directing federal agencies to act so as to "attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences." The second count accuses defendants of failing to act in accordance with the "continuing responsibility" for environmental problems required of federal agencies by section 101(b) of NEPA, insofar as they failed to incorporate air and noise pollution data obtained by them after completion and approval of the original EIS, into a supplemental EIS duly circulated among and approved by responsible public agencies. The third count alleges that the original EIS was not prepared in accordance with pertinent Federal Highway Administration (FHWA) guidelines, and count four alleges that the EIS lacked the adequacy and good faith preparation required by NEPA, and that the EIS was not prepared "by the responsible official" as directed by NEPA. The fifth count asserts that defendants violated their duty of "continuing responsibility" under NEPA by failing to file a supplemental EIS once it became apparent that the southwest quadrant of I–291 would be the only portion of the entire Hartford metropolitan beltway to be

high standards of living and a wide sharing of life's amenities; and

(6) enhance the quality of renewable resources and approach the maximum attainable recycling of depletable resources. . . . "

Section 102 of NEPA, 42 U.S.C. § 4332, provides in pertinent part:

"The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter, and (2) all agencies of the Federal Government shall—

(A) utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts in planning and in decisionmaking which may have an impact on man's environment;

(B) identify and develop methods and procedures, in consultation with the Council on Environmental Quality established by subchapter II of this chapter, which will insure that presently unquantified environmental amenities and values may be given appropriate consideration in decisionmaking along with economic and technical considerations;

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of Title 5, and shall accompany the proposal through the existing agency review processes;

(D) study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources . . . . "

constructed in the foreseeable future. Issue was joined on these five counts at a hearing of several days' duration on plaintiff's motion for a preliminary injunction.

## I.

## BACKGROUND

The general location for an expressway such as I-291 has been under consideration for some twenty years.[4] Public hearings on possible routes to be used were held in 1959 and 1961.[5] Public hearings on the design of the highway were held in 1969, 1970, and 1971.[6] The proposed highway was divided into two projects of roughly equal length, designated Conn. Projects Nos. 93–74 and 51–130. Design study reports on these projects were submitted to the FHWA, together with a request for design approval, in August, 1970,[7] and were resubmitted in revised form in December, 1970.[8] At this time the cost of constructing I-291 was estimated to be $31,500,000.[9] If I-291 is constructed as part of the federal interstate highway system, 90 per cent of the cost will be borne by the federal government, and 10 per cent by Connecticut. See 23 U.S.C. § 120(c).

It has not been disputed that FHWA supervision and funding of the planning and construction of I-291 by the FHWA constitutes "a proposal for major federal action" within the purview of section 102(C) of NEPA, which became effective January 1, 1970. Thus on February 1, 1971, the FHWA Division Engineer for Connecticut advised the Commissioner of the Connecticut Department of Transportation (CONNDOT) that an EIS would be required for I-291.[10] Personnel of CONNDOT's Bureau of Highways accordingly prepared a rough draft of an EIS.[11] This rough draft was reviewed in February, 1971, by David Densmore, a field employee of the Connecticut division of the FHWA.[12] Defendant George Koch, then Chief of Design for the CONNDOT Bureau of Highways (until March, 1971), supervised preparation of a preliminary draft EIS based on the earlier rough draft and Densmore's comments thereon.[13] During the preparation of the preliminary draft, Densmore and two other FHWA engineers spoke almost daily, in person or by telephone, with CONNDOT personnel concerning the draft EIS.[14] Defendant Koch testified that the resulting preliminary draft was based more on his experience and knowledge of the

4. "The basic concept of a connector from west of the Berlin Turnpike to New Britain evolved from survey plans prepared in April, 1955. The Newington Expressway, as it was called, provided for a multiple lane facility, grade separation structures and interchanges at major crossings with other roads. The expressway was to be included in the State Trunk Line Highway System. In accordance with section 969C of the 1953 supplement to the General Statutes, maps were prepared showing the location of the base line and the proposed taking lines in 1954 and 1956." "Final Environmental/Section 4(f) Statement, Interstate Route 291, Conn. Projects 93–74 & 51–130, January 1972" (I-291 EIS), Plaintiff's Exhibit 23, at p. 19.

5. Affidavit of defendant George S. Koch, Defendants' Exhibit H, ¶¶ 4–5.

6. *Id.*, ¶¶ 6–8.

7. Memorandum of J. F. Shugrue, Chief Engineer, CONNDOT Bureau of Highways, to

George R. Turner, Jr., FHWA Division Engineer, August 19, 1970, Plaintiff's Exhibit 4.

8. Memorandum of J. F. Shugrue to George R. Turner, Jr., December 8, 1970, Plaintiff's Exhibit 5.

9. Revised Interstate 291 Design Study Report (attached to Plaintiff's Exhibit 5, Shugrue-Turner Memorandum of December 8, 1970, *supra* note 8), at p. 5.

10. Letter of George R. Turner, Jr., to George J. Conkling, February 1, 1971, Plaintiff's Exhibit 8.

11. Undated "Environmental Statement," Defendants' Exhibit F.

12. Testimony of David H. Densmore, Nov. 28, 1973.

13. Testimony of George S. Koch, Nov. 28, 1973.

14. Densmore testimony, *supra* note 12.

project than on empirical data.[15] This preliminary draft was filed with the FHWA in June, 1971,[16] and circulated among other federal agencies,[17] including the Council on Environmental Quality (CEQ), but not including the Environmental Protection Agency (EPA).

After comments from these agencies on the preliminary EIS were received by the FHWA and CONNDOT, and after a multi-disciplinary team of experts in environmental problems had reviewed the draft EIS at the regional office of the FHWA, see Conservation Society of Southern Vermont v. Secretary of Transportation, 362 F.Supp. 627, 630 (D.Vt.1973) (Circuit Judge Oakes), the final EIS was written by CONNDOT personnel in cooperation with Densmore and other FHWA employees.[18] Also contributing to the final EIS was defendant A. J. Siccardi, who upon transfer from another state became the FHWA Division Engineer for Connecticut on June 26, 1971.[19] The final EIS [20] was submitted to the FHWA's divisional office on February 24, 1972.[21] This of-

fice forwarded the final EIS to the FHWA's regional office on February 28, 1972, with a cover letter noting that the EIS had been prepared in conformance with FHWA guidelines and recommending the EIS's acceptance.[22] After acceptance by the regional and Washington offices of the FHWA and the office of the Secretary of Transportation, the final EIS was filed with the CEQ on September 18, 1972.[23]

On or about October 4, 1972, public notice was given by newspaper publication that the EIS would be available for inspection for thirty days thereafter.[24] Shortly after the expiration of this thirty-day period, defendant Siccardi granted formal design approval for I–291 on November 6, 1972.[25] On that same day, however, defendant Siccardi requested CONNDOT to give "further consideration" to the noise and air quality impacts of I–291, to reflect advances in noise and air quality evaluation techniques since preparation of the I–291 EIS and design study reports.[26]

15. Koch testimony, *supra* note 13.

16. "Draft Environmental Impact Statement for Interstate Route 291," with cover letter dated June 3, 1971, Plaintiff's Exhibit 10.

17. A list of these agencies was attached to the cover letter of the draft EIS, Plaintiff's Exhibit 10, *supra* note 16.

18. Testimony of Donato Altobelli, Director of Office of Environment & Design, FHWA Region 1, Nov. 28, 1973; testimony of Arthur Taylor, Senior Highway Engineer, CONNDOT, Nov. 30, 1973.

19. Testimony of A. J. Siccardi, Nov. 27, 1973.

20. I–291 EIS, Plaintiff's Exhibit 23, *supra* note 4.

21. Cover letter for I–291 EIS from T. H. Sellew, Assistant Chief Engineer, CONNDOT Bureau of Highways, to A. J. Siccardi, Feb. 24, 1972, Plaintiff's Exhibit 22. *See also* Chronology of I–291 Environmental Submissions, attached to CONNDOT "Status Report" on EIS's, Feb. 25, 1972, Plaintiff's Exhibit 25.

22. Letter from Ernest W. Harris, Assistant Division Engineer, to Gerald D. Love, Regional Federal Highway Administrator, Feb. 28, 1973, Plaintiff's Exhibit 26.

23. Memorandum from Rex I. Wells, Chief, Environmental Development Division, FHWA, to Russell E. Train, Chairman, CEQ, Sept. 18, 1972, Plaintiff's Exhibit 28.

24. Memorandum from T. E. Cressey, CONNDOT, to W. E. Keish, CONNDOT, Oct. 3, 1973, requesting immediate publication of an attached legal notice concerning the filing with the CEQ and the release for public inspection of the I–291 EIS, Plaintiff's Exhibit 29.

25. Letter from A. J. Siccardi to CONNDOT Commissioner A. Earl Wood, Nov. 6, 1972, Plaintiff's Exhibit 30.

26. "We have evaluated the noise and air impacts contained in the environmental statement and design study report for the subject highway. However, the noise and air evaluations were done some time ago when the 'state of the art' was not as advanced as it is today. For this reason, we request that as design progresses the following items be given further consideration:
 (1) If additional noise sensitive areas are found, they should be fully evaluated to insure that all practical steps are taken to minimize impact.
 (2) Recognizing that CONNDOT now has available technical assistance and equip-

CONNDOT personnel completed a noise impact evaluation for I–291 in February, 1973.[27] When it sent this report to defendant Siccardi on March 6, 1973, CONNDOT noted that the report showed one area of open space to be noise sensitive, and recommended construction of a mound ten feet in height to attenuate this noise.[28] Defendant Siccardi's office concurred in this recommendation on April 4, 1973.[29]

CONNDOT commissioned an air quality study by The Research Corporation of New England (TRC),[30] which was forwarded to defendant Siccardi on June 8, 1973.[31] This report showed that projected 1990 traffic along I–291 would, under "worst-case" meteorological and traffic conditions, cause the level of hydrocarbons in the air to exceed EPA

standards at three points near the expressway.[32] On June 14, 1973, defendant Siccardi approved CONNDOT's "plans, specifications, and estimates" (P.S.&E.) for the first two miles of I–291 from I–91 to the Newington-Wethersfield town line.[33] This P.S.&E. approval committed the United States to paying its 90 per cent share of the cost of the construction outlined in the P.S.&E. See 23 U.S.C. § 106(a). See generally Arlington Coalition on Transportation v. Volpe, 458 F.2d 1323, 1328 (4th Cir. 1972), cert denied sub nom. Fugate v. Arlington Coalition on Transportation, 409 U.S. 1000, 93 S.Ct. 312, 34 L.Ed.2d 261. In the same letter in which he approved the P.S.&E. for this project, defendant Siccardi also authorized CONNDOT to solicit bids for the construction of the first two miles of I–291.[34] On

---

ment to perform more detailed air quality surveys, it is suggested that the 'before' conditions relative to air quality be reevaluated between now and PS & E submissions. This additional information should provide a better base on which to predict the after effects of this highway on the surrounding environment." Memorandum from A. J. Siccardi to CONNDOT Commissioner A. Earl Wood, Nov. 6, 1972, Plaintiff's Exhibit 31.

27. "Noise Analysis for Project No. 51–130 and 93–74, I–291 Farmington to Rocky Hill," with cover memorandum from J. Drake, CONNDOT, to W. Ginter, CONNDOT, Feb. 16, 1973, Plaintiff's Exhibit 36.

28. Cover memorandum for I–291 Noise Analysis from S. T. Bothwell, CONNDOT, to A. J. Siccardi, March 6, 1973, Plaintiff's Exhibit 37, stating in pertinent part: "As a result of the analysis, one area has been defined as being noise sensitive. The Eagle Lantern Village Open Space area (Station # 19 in the analysis) would be subjected to a predicted L10 sound level of 72 dBA when the volumes on S.R. 523 reach the levels predicted. The possibility of placing an attenuation mound between S.R. 523 and the open space area has been investigated. It has been predicted that an attenuation of 13 dBA could be expected if a 10′ high mound were constructed. A mound can be accommodated within the right-of-way for the highway ensuring no encroachment into the remaining open space area. It is proposed that a mound

be placed adjacent to the Eagle Lantern Open Space area and continued adjacent to the State-owned property that is proposed as replacement land in the Section 4(f) Statement."

29. Memorandum from Ernest W. Harris, Assistant Division Engineer, FHWA, to A. Earl Wood, Commissioner of CONNDOT, April 4, 1973, Plaintiff's Exhibit 38.

30. "Air Quality Study of Proposed Interstate I–291, Rocky Hill to Farmington, Connecticut," May, 1973, Plaintiff's Exhibit 39.

31. Cover memorandum from R. W. Gubala, CONNDOT, to A. J. Siccardi, June 8, 1973, Plaintiff's Exhibit 40.

32. "Basically the results indicate compliance with federal air quality standards for the transportation pollutants within 200 feet of the highway, with the exception of one pollutant (hydrocarbons) at three specific locations where receptors up to a distance of 450 feet from the highway would be affected if the worst combination of traffic and meteorological conditions occurred simultaneously." Id.

33. Letter from A. J. Siccardi to A. Earl Wood, Commissioner of CONNDOT, June 14, 1973, Plaintiff's Exhibit 41. This initial two-mile segment of I–291 was split out of one of the two original projects comprising I–291, project no. 93–74, and assigned its own project number, 159–121. See p. 236, infra.

34. Siccardi-Wood letter of June 14, 1973, Plaintiff's Exhibit 41, supra note 33.

September 6, 1973, a $10,996,216.92 contract for this construction was awarded to Arute Brothers, Inc. (Arute).[35] Arute began work under the contract on September 19, 1973.[36] Its operations to the date of the hearing consisted of grading, clearing, and drainage work, and the construction of temporary approaches.[37]

On October 12, 1973, defendant Siccardi notified CONNDOT that his office was accepting "without reservation the Air Quality Study as submitted."[38] A memorandum of the same date from FHWA field engineer Densmore to Siccardi[39] noted that reevaluation of the study had been prompted by the circulation on August 31, 1973, of an FHWA "Notice of Air Quality," a document not part of the record in this case but apparently concerned with air quality standards for federally funded highways.[40] The Densmore memorandum accepted the conclusion of the TRC study that I–291 would not cause significant air quality problems, and recommended no further delay in "future P.S. &E. approvals for the remaining projects on this section [of I–291] due to air quality considerations."[41]

## II.

## LACHES

The defendant state and federal officials as well as the Connecticut Construction Industries Association (as *amicus curiae*) have asserted laches as an affirmative defense to plaintiff's action. Comprehensive consideration of this defense is necessary because of the differing significance regarding laches, individually or in various combinations, of the alleged failures of defendants to comply with NEPA and the hardships threatened by plaintiff's claims for relief as to each such failure. The essence of defendants' laches claim is that plaintiff was on notice of the contents of the final EIS for I–291 once the EIS was made available for public inspection on or about October 4, 1972, and for thirty days thereafter. Thus defendants contend that it was unreasonable for plaintiff to wait until November 12, 1973, to file its complaint challenging the adequacy of the EIS. Defendants claim prejudice because in the intervening thirteen months the design of I–291 was given final FHWA approval (November 6, 1972), the P.S.&E. for the initial segment was approved (June 14, 1973), bids were solicited and a contract for the initial segment awarded (September 6, 1973), and construction had begun (September 19, 1973).

Defendants rely primarily on Clark v. Volpe, 342 F.Supp. 1324 (E.D.La.1972), aff'd 461 F.2d 1266 (5th Cir. 1972), in which laches was held to bar a suit to stop an interstate highway for, among other reasons, the failure of federal officials to file an EIS. Federal P.S.&E. approval[42] of the highway was granted

---

35. Affidavit of George S. Koch, Defendants' Exhibit H, *supra* note 5, ¶ 14.

36. *Id.*, ¶ 15.

37. *Id.*; Brief of the Connecticut Construction Industries Association (Amicus Curiae) at p. 4; Affidavit of Plaintiff's Counsel Alphonse R. Noë, Plaintiff's Exhibit 50, ¶ 9.

38. Letter from A. J. Siccardi to defendant Joseph E. Burns, Commissioner of CONNDOT, Oct. 12, 1973, Plaintiff's Exhibit 47.

39. Memorandum from D. H. Densmore, FHWA Field Operations Engineer, to A. J. Siccardi, Oct. 12, 1973, Plaintiff's Exhibit 46.

40. Siccardi testimony, *supra* note 19.

41. Densmore-Siccardi memorandum of Oct. 12, 1973, *supra* note 39.

42. P.S. & E. approval is not specifically mentioned anywhere in the *Clark* opinion. I assume the court was referring to P.S. & E. approval when it declared: "On May 25, 1971, the Secretary of Transportation gave final approval to the I–610 federal-aid highway project. On that same date highway contractors were invited to bid on the section of land parallel to the railroad tracks in City Park. Intervenor, Boh Brothers, was the successful bidder and a construction contract was signed on July 14, 1971. Boh Brothers was authorized to begin construction on July 19, 1971." 342 F.Supp. at 1327. The court had already indicated that "design approval" had occurred in 1966, 342

in May, 1971; construction began in July, 1971; plaintiffs filed suit in February, 1972. Assuming, *arguendo,* that the May, 1971, P.S.&E. approval date was the crucial date for determining the applicability of laches, the *Clark* court concluded that plaintiffs had delayed unreasonably in waiting to bring their action, since at the time of the hearing on laches, one month later, the contested construction was 25–30 per cent complete.

> "It is inconceivable that plaintiffs, charged with knowledge of approximately fifteen years of publicity concerning the highway, were not on notice as of May 25, 1971 that actual construction would soon proceed unless legal action was promptly initiated. Nevertheless, plaintiffs stood idly by during the remaining months as bulldozers and chain saws stripped and leveled the land and as vast sums of public money were expended on highway construction. Finally, after the area had been laid barren of trees or grass, and after several million dollars had been spent for highway development, plaintiffs, on February 24, 1972, belatedly filed suit to halt construction. The Court holds that, under the circumstances of this particular case, plaintiffs' delay in filing suit, during which delay the very acts of which they complain were being performed, was unreasonable, and defendants and intervenors would be substantially prejudiced if plaintiffs were allowed injunctive relief." Clark v. Volpe, *supra,* 342 F.Supp. at 1329.

Plaintiff does not dispute the validity of *Clark's* statement of the law of laches, and is content to distinguish *Clark* on its facts. Plaintiff invokes the equi-table nature of the doctrine of laches, and from this perspective stresses what it considers to have been inequitable aspects of defendants' conduct. Thus plaintiff emphasizes that the best evidence of the possible inadequacy of the I–291 EIS—the air and noise pollution studies requested by the FHWA on the same day as design approval for the project was granted—was not made known to the public.[43] Plaintiff also notes that the two mile segment on which construction was started was not separated from the rest of the I–291 project and slated for early construction until after design approval. See p. 236, *infra.* Plaintiff contends that once it became apparent that this first segment would be constructed in advance of the rest of the project, it advised Arute and state and federal officials in September, prior to the start of construction, of its continuing objection to construction of I–291.[44] Plaintiff retained counsel on October 25, 1973, and it was apparently not until counsel's inspection of CONNDOT's files on October 31, 1973, that the supplemental air and noise pollution studies were made known to plaintiff.[45] On these facts plaintiff contends it was duly diligent, and that Arute and state and federal officials were put on notice that their failure to agree to a moratorium on construction might expose them to the risk of an injunction after commencement of construction.

Defendants' view of the facts stresses the prejudice which would be suffered by their agents should construction of I–291 be enjoined. Defendant Koch has estimated Arute's per diem expenses while construction is in progress to be $27,200.[46] Some of this expense would

---

F.Supp. at 1326, so its term "final approval," after which the receipt of contract bids and the commencement of construction followed in rapid succession, must refer to P. S. & E. approval. Moreover, it appears to be customary for P.S. & E. approval and FHWA authorization of solicitation of bids for the construction contract to be issued simultaneously. *See* Siccardi-Wood letter of June 14, 1973, Plaintiff's Exhibit 41, *supra* note 33.

43. Koch testimony, *supra* note 13.

44. Noë affidavit, *supra* note 37, ¶ 34.

45. *Id.,* ¶¶ 34–36.

46. Koch affidavit, Defendants' Exhibit H, *supra* note 5, ¶ 16.

continue, and new expenses of storage and protection of materials would be incurred, should an injunction issue.[47] Koch also estimates the cost of restoring destroyed vegetation to be in excess of $100,000.[48] Land acquisition and design of the expressway have been largely completed by the state; Koch estimates Connecticut's expenses in these regards to be $15,000,000.[49]

It must be noted preliminarily that this lattermost figure for Connecticut's general expenses in connection with I–291 cannot fairly be weighed against plaintiff in considering the applicability of laches. Connecticut has been planning and preparing for a highway such as I–291 since the 1950's. Only a fraction of the expenses thus incurred by Connecticut could have been avoided or postponed had plaintiff brought suit as soon as its cause of action under NEPA accrued, and defendants have made no showing as to what this fraction might be. In this regard, it is important to remember that what is in issue here is not the state's decision to build an expressway but rather the federal government's decision to participate in the construction of that expressway by approving its design, incorporating it within the interstate highway system, and accordingly underwriting 90 per cent of its cost. Plaintiff had no right, let alone obligation, to bring suit until the FHWA's sponsorship of I–291 reached the point of a "proposal for . . . major Federal action" within the ambit of section 102(2)(C) of NEPA, 42 U.S. C. § 4332(2)(C), and whatever the consideration to which the state's prior expenditures might be entitled in this Court's weighing of the equities of granting injunctive relief, these prior expenditures are not material to the issue of laches.

Because of the many stages at which FHWA approval is required if a state highway project is to be funded as an interstate highway, see generally Arlington Coalition on Transportation v. Volpe, supra, 458 F.2d at 1328, neither the record of this case nor prior law conclusively establishes any single FHWA decision as the crucial one which transformed I–291 from a tentative project into a proposal for major federal action which plaintiff could attack through NEPA. Apportionments among the states of available federal highway funds are made each fiscal year, under 23 U.S.C. § 104. After receiving notice of their apportionments, the states are to submit programs of proposed projects to be funded by the apportioned moneys. 23 U.S.C. § 105. Approval of a state's program under 23 U.S.C. § 105 is a prerequisite to submission of P.S.&E. for approval under 23 U.S.C. § 106. But 23 U.S.C. § 128, requiring public hearings on proposed interstate highways' locations, and reports of consideration given to objections to proposed interstate highways' locations and designs expressed at such hearings, has been interpreted by the FHWA as requiring the additional steps of "location approval" and "design approval" before P.S.&E. approval. Thus FHWA Policy and Procedure Memorandum (PPM) 20–8, "Public Hearings and Location Approval," promulgated January 14, 1969,[50] sets up a "two-hearing procedure" for compliance with 23 U.S.C. § 128.[51] A "corridor public hearing" must be held to consider the location of a proposed highway project, and a transcript of this hearing transmitted to the FHWA, before the FHWA division engineer may approve the route location and authorize design engineering.[52] After "location approval," a "highway design public hearing" must be held to provide "a full opportunity for presenting views on major highway design features, including the social, economic, environmental, and other effects of alternate designs," before the FHWA division engineer can

47. *Id.*

48. *Id.*

49. *Id.*, ¶ 21.

50. Plaintiff's Exhibit 2.

51. PPM 20–8, ¶ 1.b.

52. PPM 20–8, ¶¶ 4.a, 10.d.1.

grant "design approval." [53] P.S.&E. approval cannot precede design approval.[54]

The FHWA has established location approval as the stage at which a state highway project proposed in contemplation of federal funding must be the subject of an EIS. Thus PPM 90–1,[55] which evolved from the FHWA's November 24, 1970, interim guidelines on compliance with NEPA,[56] requires that a draft EIS be circulated among appropriate agencies and be made available to the public in advance of the location (i. e., corridor) public hearing prescribed by PPM 20–8.[57] The FHWA may not grant location approval until at least thirty days after the final EIS has been filed with the CEQ and made available to the public.[58] However, the FHWA has also designated design approval as the crucial stage, at least where location approval but not design approval had been granted prior to February 1, 1971. "In such instances the environmental statement . . . or negative declaration shall be prepared and processed during the design studies. The final environmental statement or negative declaration for such highway sections shall be furnished to FHWA before or with the request for design approval." [59]

■ ■ The overall thrust of the FHWA's procedures seems to be that while location approval is a preferable stage for preparation of an EIS, allowing more time for accommodation of problems raised in an EIS, design approval is the stage at which NEPA affirmatively requires preparation of an EIS.[60] While recognizing the significance of design approval, courts have nevertheless been reluctant to assign design approval talismanic value, so as to exempt absolutely from NEPA highway projects which had received design approval prior to the January 1, 1970 effective date of NEPA. Thus the Fourth Circuit, having held "that Section 102(C) [NEPA's EIS requirement] is applicable to a project until it has reached the state of completion where the costs of abandoning or altering the proposed route would clearly outweigh the benefits therefrom," concluded that "[m]anifestly the date of design approval alone does not measure whether [an interstate highway project] has reached the crucial stage, and determining the applicability of Section 102(C) by this' standard alone would be arbitrary and capricious agency action and an abuse of administrative discretion." Arlington Coalition on Transportation v. Volpe, *supra*, 458 F.2d at 1332. However, it appears that while a balancing-of-the-factors approach is required to determine if an EIS is required of a highway project which had received FHWA design approval before 1970, such an approach cannot work in reverse to exempt from the EIS requirement a highway project which received design approval *after* January 1, 1970. Conservation Society of Southern Vermont v. Volpe, 343 F. Supp. 761, 766–767 (D.Vt.1972) (Circuit

53. PPM 20–8, ¶¶ 4.b, 10.d.2.

54. PPM 20–8, ¶ 10.d.2; PPM 90–1, *infra* note 55, ¶ 5.3.1.

55. FHWA "Guidelines for Implementing Section 102(2)(C) of the National Environmental Policy Act of 1969 [and other acts]," Aug. 24, 1971, Plaintiff's Exhibit 12.

56. FHWA "Interim Guidelines for Implementation of Section 102(2)(C) of the National Environmental Policy Act of 1969," Nov. 24, 1970, circulated Nov. 30, 1970, attached to Defendants' Exhibit A.

57. PPM 90–1, ¶ 6.c.

58. PPM 90–1, ¶ 6.1.2.b.

59. PPM 90–1, ¶ 6.h.

The FHWA has purported to declare NEPA's EIS requirement altogether inapplicable to highway projects which had received design approval prior to February 1, 1971. PPM 90–1, ¶ 5.a. Judge Newman of this Court has already ruled that "[t]his attempt to postpone the effective date of NEPA by thirteen months is contrary to the words and spirit of the legislation and cannot be permitted to stand." Committee to Stop Route 7 v. Volpe, 346 F.Supp. 731, 737 (D. Conn.1972).

60. *Cf.* Committee to Stop Route 7 v. Volpe, *supra* note 59, 346 F.Supp. at 736, n. 3: "PPM 20–8 established 'design approval' as a formal step in the long gestation period of highway creation."

Judge Oakes); Committee to Stop Route 7 v. Volpe, 346 F.Supp. 731 (D.Conn. 1972). Of course, equitable consideration of the extent of completion of a highway project which did receive design approval after January 1, 1970, might still influence the decision whether or not an injunction should issue because of the failure to comply with NEPA. Committee to Stop Route 7 v. Volpe, *supra*, 346 F.Supp. at 738.

I conclude that plaintiff herein could have challenged defendants' compliance with NEPA once defendant Siccardi granted design approval to I–291 on November 6, 1972, at which point I–291 became a proposal for major federal action. This does not necessarily mean, however, that the entire year from that date until plaintiff's complaint was filed on November 12, 1973, must be counted against plaintiff in considering for the purpose of laches if plaintiff delayed unreasonably. As was stated in the very case on which defendants principally rely for their argument in favor of invoking laches:

> "Laches is not merely a question of time; it is a question of diligence as well. [Citation omitted.] There is no certain period of time within which a plaintiff may reasonably delay before filing suit; that 'reasonable' period varies upon the circumstances of each case. . . . [¶] Laches is an equitable doctrine and will be applied where it would be inequitable to permit plaintiffs to proceed." Clark v. Volpe, *supra*, 342 F.Supp. at 1328.

It is true that prior to the November 6, 1972, design approval of I–291, the final EIS on I–291 had been available for public inspection, and hence plaintiff had had an opportunity to assess the adequacy of the EIS and so determine if defendants' compliance with NEPA should be tested by litigation. But this fact alone will not support the conclusion that plaintiff had to attack the EIS forthwith or forever hold its peace. Plaintiff has emphasized that it did not regard the I–291 EIS as inadequate enough to warrant litigation until it became aware of the air and noise studies requested by defendant Siccardi contemporaneously with his grant of design approval. Moreover, although this design approval established I–291 as a proposal for major federal action within the purview of NEPA, it did not leave the FHWA irrevocably committed to funding I–291. This commitment is not made until the stage of P.S.&E. approval is reached. 23 U.S.C. § 106(a). At the time of design approval, P.S.&E. approval was still some distance away. Indeed, it was not until June 14, 1973, that P.S.&E. approval was granted, and even then only for the initial two-mile segment of I–291, Project No. 159–121, which segment did not even exist until November 9, 1972, when it was broken out of Project No. 93–74, one of the two original projects forming I–291, given a separate project number and scheduled for completion "at least one (1) year before the second section, and possibly much longer." [61]

■■ Had plaintiff filed suit during the seven months between the granting of design approval and the P.S. & E. approval of the initial two-mile segment of I–291, the prejudice attributable to a suspension of work by Arute could indeed have been avoided. But this Court is chary of forcing on those in plaintiff's position at the time of design approval the choice between filing a suit without a good faith belief in its merits or losing the opportunity to sue later should new facts come to light raising substantial questions as to the adequacy of the EIS upon which design approval was originally granted. The better position, as suggested in Clark v. Volpe, *supra*, 342 F.Supp. at 1328–1329, is to allow one opposed to a proposed federally-funded highway to presume, in

61. Memorandum from R. M. Williston, CONNDOT, to F. J. Thompson, CONNDOT, Jan. 22, 1973, submitted by plaintiff on Dec. 28, 1973, after the hearing on the instant motion, in clarification of ¶ 33 of the affidavit of Noë, *supra* note 37.

the absence of evidence to the contrary, that public officials will properly fulfill their statutory obligations until such time as P.S.&E. approval makes the commencement of actual construction imminent. Once P.S.&E. approval issues, a potential plaintiff must decide if there is sufficient reason to warrant suspicion of non-compliance. If such suspicion is justified, the plaintiff must then act diligently to develop its case and, if this results in a good faith belief in non-compliance with pertinent statutes, file its complaint.

Applying these principles to the instant case, it must be noted that the seven month period from November, 1972, to June, 1973, was the very time in which defendant Siccardi was awaiting CONNDOT's compliance with his request for air and noise pollution studies. Had Siccardi's concern over the adequacy, under current standards, of the air and noise pollution studies underlying the EIS been made a matter of public record at the time of his grant of design approval, plaintiff might now be held accountable in equity for not having promptly challenged the grant of design approval. Lacking any such evidence to overcome the presumption that defendants had complied fully with NEPA before deciding to go forward with I–291, plaintiff was not so obliged to commence litigation in November, 1972. Not until the P.S.&E. approval of June 14, 1973, was plaintiff affirmatively on notice that, barring litigation, I–291 would be constructed as planned. It was then no longer reasonable for plaintiff to presume that any necessary modifications in the I–291 EIS and consequent reconsideration of I–291 would be undertaken by defendants, on their own initiative and in advance of commencement of construction of I–291, in recognition of their "continuing responsibility" under section 101(b)(3) of NEPA "to improve and coordinate Federal plans, functions, programs and resources to the end that the Nation may . . . attain the widest range of beneficial uses of the environment without degradation, risk

to health or safety, or other undesirable and unintended consequences." 42 U.S. C. § 4331(b)(3).

By moving promptly after the P.S.& E. approval of June 14, 1973, plaintiff might still have minimized the prejudice to defendants, and it is for the five months' delay between June 14, 1973, and November 12, 1973, that plaintiff stands in real risk of laches. It is at this point that plaintiff's special status as essentially a public interest litigant seeking to vindicate public rights under NEPA must be considered. Environmental litigation is complex and costly; even the decision when to seek counsel with a view toward litigation is difficult, since the posture of a public works project is inevitably obscured by the mists of bureaucracy. With few exceptions environmental action groups—especially those such as plaintiff organized in ad hoc response to a particular project—lack the resources affording access to legal advice in advance of a decision to litigate. The interests of the members of such groups are generally inchoate and decentralized until action is galvanized and funds are mobilized by some startling disclosure which awakens the public to the possibly dire consequences of an imminent intrusion on the environment. Yet dozens of cases have demonstrated that absent the advocacy of such groups, the procedural rights and protections enshrined in NEPA stand in jeopardy of being ignored with impunity. See, e. g., Monroe County Conservation Council v. Volpe, 472 F.2d 693 (2d Cir. 1972); Arlington Coalition on Transportation v. Volpe, *supra*; Calvert Cliffs' Coordinating Committee v. United States Atomic Energy Comm., 146 U.S.App.D.C. 33, 449 F.2d 1109 (1971); Committee to Stop Route 7 v. Volpe, *supra*; Conservation Society of Southern Vermont v. Volpe, *supra*.

This Circuit has joined others which have recognized in NEPA a Congressional mandate for scrupulous official conduct when environmental impacts are in the offing, and have seen the forcefulness of this mandate as authorizing

special judicial solicitude of those who seek *pro bono publico* to ensure that the Government and its agents live up to NEPA. The call for vigorous judicial enforcement of NEPA was first sounded by the District of Columbia Circuit. Courts dealing with NEPA litigation were said to have the duty "to see that important legislative purposes, heralded in the halls of Congress, are not lost or misdirected in the vast hallways of the federal bureaucracy." Calvert Cliffs' Coordinating Committee v. United States Atomic Energy Commission, *supra*, 449 F.2d at 1111. The *Calvert Cliffs'* court emphasized that the procedural provisions of NEPA "establish a strict standard of compliance," 449 F.2d at 1112, and that "[c]onsiderations of administrative difficulty, delay or economic cost will not suffice" to excuse non-compliance with NEPA. 449 F.2d at 1115. The Second Circuit has since accorded explicit approval to *Calvert Cliffs'* construction of NEPA. Greene County Planning Board v. Federal Power Commission, 455 F.2d 412, 420 (2d Cir. 1972), cert. denied 409 U.S. 849, 93 S.Ct. 56, 34 L.Ed.2d 90. "[W]e can only add our voice to that of the District of Columbia Circuit in *Calvert Cliffs'*: Delay is a concomitant of the implementation of the procedures prescribed by NEPA . . . . . 'It is far more consistent with the purposes of the Act to delay operation at a stage where real environmental protection may come about than at a stage where corrective action may be so costly as to be impossible.' [*Calvert Cliffs'*, 449 F.2d] at 1128." Greene County Planning Board v. Federal Power Commission, *supra*, 455 F.2d at 422–423.

Subsequent to both *Calvert Cliffs'* and *Greene County*, the Fourth Circuit declined to invoke the doctrine of laches to bar a suit to halt an interstate highway, even though the plaintiffs-appellants therein had caused considerable prejudice to the defendants-appellees by failing to institute litigation promptly once NEPA had granted them a cause of action. From the very first words of its opinion, the court emphasized the special status of environmental litigation, and then proceeded to justify its refusal to honor the claim of laches by express reference to that status.

"This is an ecology case. It is the declared public policy of the United States to protect and preserve the national environment 'to the fullest extent possible.' National Environmental Policy Act of 1969, 42 U.S.C.A. § 4332 (NEPA). The NEPA is a value judgment by the Congress that in order to 'foster and promote the general welfare' each generation of Americans must, beginning now, act 'as trustee of the environment for succeeding generations.' 42 U.S.C.A. § 4331. We hold that even essential highway construction must yield to the congressionally structured priority.

\* \* \* \* \* \*

We conclude that the federal statutes invoked by appellants are applicable to Arlington I–66 and must be complied with before further steps may be taken towards construction of this highway. Compliance means not only reconsideration of the proposed location of Arlington I–66 in the light of environmental, social, and economic policies set forth in the statutes; it means also suspension of work on Arlington I–66 pending this reconsideration. Further investment of resources by appellees in the proposed route would render alteration or abandonment of the proposed route increasingly costly and, therefore, increasingly unwise. If appellees were thus allowed to limit their options during their reconsideration of the location of Arlington I–66, reconsideration would be a hollow gesture. See Calvert Cliffs' Coordinating Committee, Inc. v. United States Atomic Energy Commission, 146 U.S.App.D.C. 33, 449 F. 2d 1109, 1128 (1971).

\* \* \* \* \* \*

[A]ppellees claim that appellants' suit should be barred by laches. Appellees as representatives of the general public and specific interest

groups will be prejudiced by appellants' delay in bringing suit if the proposed route for Arlington I–66 is altered or abandoned. Most of the right-of-way for the proposed route has been acquired; Arlington County's planning with respect to zoning, traffic, and location of utilities has been based upon the route; and the location of numerous businesses has been chosen in reliance upon the route. Appellants could have brought suit earlier to minimize or avoid this harm; all of the relevant statutes were in effect by January 1, 1970, but appellants did not file suit until February 19, 1971. Nevertheless, we decline to invoke laches against appellants because of the public interest status accorded ecology preservation by the Congress. [Footnote omitted.] We believe that Arlington I–66 has not progressed to the point where the costs of altering or abandoning the proposed route would *certainly* outweigh the benefits that might accrue therefrom to the general public. In their reconsideration of the proposed route, the Secretary of Transportation and the Commissioner of the Virginia Department of Highways may decide, of course, that the costs do outweigh the benefits. If the opposite conclusion is a reasonable possibility, however, as it is here, the congressional declaration of policy in the relevant statutes of the importance of the benefits that might accrue demands that the merits of the question be considered by the appropriate agencies." Arlington Coalition on Transportation v. Volpe, *supra,* 458 F.2d at 1326, 1327, 1329–1330 (emphasis in original).

*Accord,* Environmental Defense Fund v. Tenn. Valley Auth., 468 F.2d 1164, 1182–1183 (6th Cir. 1972).

Besides the special status of plaintiff, the conduct of defendants must also be considered in assessing whether plaintiff was properly diligent after June 14, 1973. Defendants did not make public the post-EIS air and noise pollution studies, even though these studies revealed that more substantial air and noise pollution impacts than were discussed in the EIS might result from I–291. While the studies offered no conclusive evidence of the advisability *vel non* of building I–291, they at least made the advisability of proceeding with I–291 a question upon which, in the light of the two studies, reasonable men could disagree. These reports were sure fuel for any environmentalists opposed to I–291; had they been made public plaintiff might now reasonably be held accountable for failing to bring its action shortly after defendant Siccardi's grant of P.S.&E. approval. In the absence of disclosure of the reports, only the actual commencement of construction prodded plaintiff into actively .condering litigation. Counsel were retained in late October, 1973; once plaintiff gained through counsel access to the documentary record of defendants' decision making, plaintiff's suit was promptly filed.

The "unconscionable delay" requisite for successful assertion of the defense of laches "can occur only after a party discovers or by the exercise of reasonable diligence could have discovered the wrong of which he complains." Ward v. Ackroyd, 344 F.Supp. 1202, 1212 (D.Md.1972). In the instant case, as in Ward v. Ackroyd (where FHWA compliance with 23 U.S.C. § 128 and PPM 20–8 was in issue), "there is no evidence that plaintiffs *knowingly* sat on their rights and delayed bringing suit." *Id.* (Emphasis in original.) While I certainly find no evidence whatsoever of bad faith on the part of defendants in keeping the post-EIS air and noise pollution reports off the public record, and do not doubt that the reports would have been disclosed much earlier had plaintiff been aware of the proper inquiries to make,[62] the fact remains that environ-

---

62. *Cf.* Noë affidavit, *supra* note 37, ¶¶ 38, 40:

"In connection with my review of documents at the Connecticut Department of

mental litigants generally do not have legal counsel at their fingertips, and depend on public disclosure of the details of proposals for major federal actions in order to determine if the threat to their interests is sufficiently grave to warrant organized political and legal opposition.

Also pertinent to the significance in equity of plaintiff's delay is the extent of the construction of I–291 which has already taken place. Unlike Clark v. Volpe, *supra*, the interstate highway project here in issue is nowhere near 25 to 30 per cent complete, even as to the initial two-mile segment.

■■■ In view of all the circumstances of the case, and especially the special status accorded litigants such as plaintiff, I rule that plaintiff's delay in bringing suit was not so unreasonable, nor its consequences so unconscionable, as to constitute laches as a bar to temporary relief. As Judge Friendly has written: "The tardiness of the parties in raising the issue cannot excuse compliance with NEPA; primary responsibility under the Act rests with the agency." City of New York v. United States, 337 F.Supp. 150, 160 (E.D.N.Y. 1972) (three-judge court).

### III.

### SUBSTANTIVE AND PROCEDURAL REVIEW UNDER NEPA

■■■ Before commenting and ruling on plaintiff's broad-ranging attack on defendants' compliance with NEPA, the role of this Court in NEPA litigation should be considered. NEPA confers no jurisdiction on this Court to re-view the wisdom of federal financing of a proposed expressway. See, e. g., Committee to Stop Route 7 v. Volpe, *supra*, 346 F.Supp. at 739. Of course, arbitrary decisions concerning federal highway monies may be set aside under the Administrative Procedure Act, which permits judicial invalidation of administrative decisions which are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . ." 5 U.S.C. § 706(2)(A). Under this standard, "the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. [Citations omitted.] Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971). The passage of NEPA has yet to be shown by authoritative construction to have broadened this limited grant of power to the judiciary to review the substantive merits of agency action. See City of New York v. United States, 344 F.Supp. 929, 939–940 (E.D.N.Y.1972) (opinion of Circuit Judge Friendly) (three-judge court). However, the Administrative Procedure Act's narrow standard of substantive review does not preclude judicial "inquiry . . . whether the . . . action followed the necessary *procedural* requirements." Citizens to Preserve Overton Park v. Volpe, *supra*, 401 U.S. at 417, 91 S.Ct. at 824 (emphasis added). It is in the area of proce-

---

Transportation, I had to request the Connecticut Deputy Commissioner of Transportation to instruct Mr. Taylor to permit me to look at the file which underlay the environmental statement. Later, as I was reviewing the file, I asked Mr. Taylor if I might have copies and he informed me that he had been instructed by his Superior, Mr. Cressy [sic], to permit me to make notes only. In addition, when I requested other material pertaining to the I–291 Southwest Quadrant and the I–291 belt route, I was referred to other departments with vague instructions.

 * * * * *

I do not suggest that defendants were obstructionist or that I was given a "run around". However, it appears to me that inherent bureaucratic delay and the understandable reluctance of FHWA and Conn. DOT personnel to furnish files without extensive approval can best be overcome by obtaining discovery formally in this action."

dural review that NEPA has indisputably opened wide judicial vistas, which were explored in detail in *Calvert Cliffs'*.

"[T]he general substantive policy of the Act is a flexible one.[63] It leaves room for a responsible exercise of discretion and may not require particular substantive results in particular problematic instances. However, the Act also contains very important "procedural" provisions—provisions which are designed to see that all federal agencies do in fact exercise the substantive discretion given them. These provisions are not highly flexible. Indeed, they establish a strict standard of compliance.

. . . Perhaps the greatest importance of NEPA is to require the Atomic Energy Commission and other agencies to *consider* environmental issues just as they consider other matters within their mandates. This compulsion is most plainly stated in Section 102. There, 'Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this Act * * *.' Congress also 'authorizes and directs' that '(2) all agencies of the Federal Government shall' follow certain rigorous procedures in considering environmental values. [Footnote omitted.]

\* \* \* \* \* \*

Of course, all of these Section 102 duties are qualified by the phrase 'to the fullest extent possible.' We must stress as forcefully as possible that this language does not provide an escape hatch for footdragging agencies; it does not make NEPA's procedural requirements somehow 'discretionary.' Congress did not intend the Act to be

such a paper tiger. Indeed, the requirement of environmental consideration 'to the fullest extent possible' sets a high standard for the agencies, a standard which must be rigorously enforced by the reviewing courts.

Unlike the substantive duties of Section 101(b), which require agencies to 'use all practicable means consistent with other essential considerations,' the procedural duties of Section 102 must be fulfilled to the 'fullest extent possible.' [Footnote omitted.]

. . . .

\* \* \* \* \* \*

We conclude, then, that Section 102 of NEPA mandates a particular sort of careful and informed decisionmaking process and creates judicially enforceable duties. The reviewing courts probably cannot reverse a substantive decision on its merits, under Section 101, unless it be shown that the actual balance of costs and benefits that was struck was arbitrary or clearly gave insufficient weight to environmental values. But if the decision was reached procedurally without individualized consideration and balancing of environmental factors—conducted fully and in good faith—it is the responsibility of the courts to reverse." 449 F.2d at 1112, 1114, 1115 (emphasis in original).

▮▮▮ *Calvert Cliffs'* thus contemplated the use of two different standards of review of agency actions subject to NEPA: a "strict" standard for reviewing compliance with NEPA's "rigorous" procedural duties, a lenient standard for reviewing compliance with NEPA's "flexible" substantive duties. The reviewing court can properly demand strict compliance with NEPA's procedural requirements for gathering and discussing information on the environmental consequences of a proposed

---

63. *Calvert Cliffs'* characterized the "basic substantive policy" of NEPA as requiring "that the federal government 'use all practicable means and measures' to protect environmental values. Congress did not establish environmental protection as an exclusive goal; rather, it desired a reordering of priorities, so that environmental costs and benefits will assume their proper place along with other considerations." 449 F.2d at 1112.

project in advance of a decision by the agency to proceed with the project. The agency's preparation of an EIS cannot be a cursory exercise of filling in blanks. "NEPA requires that an agency must—to the *fullest* extent possible under its other statutory obligations—consider alternatives to its actions which would reduce environmental damages. That principle establishes that consideration of environmental matters must be more than a *pro forma* ritual." *Calvert Cliffs', supra,* 449 F.2d at 1128 (emphasis in original). *Cf.* Nat'l Helium Corp. v. Morton, 486 F.2d 995, 1001–1002 (10th Cir. 1973); Conservation Society of Southern Vermont v. Secretary of Transportation, *supra,* 362 F.Supp. at 632–636.

Although the Second Circuit has yet to pass on this exact issue, it appears that if the EIS survives this strict scrutiny, the reviewing court cannot extend its strict scrutiny to the agency's substantive decision to proceed with the project despite the impacts considered in the procedurally adequate EIS. Under both the Administrative Procedure Act, as explicated in *Overton Park,* and section 101 of NEPA, as explicated in *Calvert Cliffs',* an agency's decision to proceed with a project may be set aside upon review of its merits only when the decision is arbitrary or capricious or an abuse of discretion, as when the decision displays such callous disregard of the environmental considerations expressed in the EIS as to support an inference of bad faith on the part of the agency in deciding nonetheless to proceed with the project. See, e. g., Sierra Club v. Froehlke, 486 F.2d 946, 951–953 (7th Cir. 1973); Silva v. Lynn, 482 F.2d 1282, 1283 (1st Cir. 1973); Conservation Council of North Carolina v. Froehlke, 473 F.2d 664, 665 (4th Cir. 1973); Jicarilla Apache Tribe of Indians v. Morton, 471 F.2d 1275, 1281 (9th Cir. 1973); Environmental Defense Fund v. Corps of Engineers, 470 F.2d 289, 298–300 (8th Cir. 1972), injunction denied, 409 U.S. 1072, 93 S.Ct. 1072, 34 L.Ed.2d 661; Sierra Club v. Froehlke, 359 F.Supp. 1289, 1332–1334 (S.D.Tex. 1973); City of New York v. United States, *supra,* 344 F.Supp. at 939–940. *Cf.* Scenic Hudson Preserv. Conf. v. Federal Power Commission, 453 F.2d 463, 468, 481 (2d Cir. 1971), cert. denied, 407 U.S. 926, 92 S.Ct. 2453, 32 L.Ed.2d 813 (1971).[64]

## IV.
## DEFENDANTS' COMPLIANCE WITH NEPA

Plaintiff has attacked defendants' compliance with NEPA on many fronts.

---

64. *Scenic Hudson* held only that agency action *already* subject to a "substantial evidence" standard of review (under the Federal Power Act, § 313(b), 16 U.S.C. § 825*l*(b)) was not subject to a stricter standard of review under NEPA.

In considering what standard of review to employ for review of an agency's threshold determination that no EIS was required because a proposal for major federal action by the agency would not significantly affect the quality of the human environment within the meaning of section 102(2)(C) of NEPA, 42 U.S.C. § 4332(2)(C), the Fifth Circuit has relied on *Overton Park* to support its fashioning of a "reasonableness" standard of review which is stricter than the "arbitrary or capricious" standard. Save Our Ten Acres v. Kreger, 472 F.2d 463 (5th Cir. 1973). *Accord,* Wyoming Outdoor Coordinating Council v. Butz, 484 F.2d 1244, 1249 (10th Cir. 1973). The *Kreger* court noted, however, that *Overton Park* did mandate use of the "arbitrary or capricious" standard for review of the merits of an agency's substantive decision to proceed with a project despite the adverse impacts predicted by a procedurally adequate EIS. "[T]he [*Overton Park*] Court made it clear that the ultimate merit decision based upon a weighing of these environmental considerations should be reviewed under the arbitrary, capricious, or abuse of discretion standard . . . ." 472 F.2d at 466. The Second Circuit and the Seventh Circuit, by contrast, have refused to use anything stricter than an "arbitrary or capricious" standard in reviewing an agency's threshold decision that proposed action is not within the purview of NEPA. Hanly v. Kleindienst, 471 F.2d 823, 830 (2d Cir. 1972), cert. denied, 412 U.S. 908, 93 S. Ct. 2290, 36 L.Ed.2d 974 (1973). *Accord,* First Nat'l Bank of Chicago v. Richardson, 484 F.2d 1369, 1381 (7th Cir. 1973). *See also* Town of Groton v. Laird, 353 F.Supp. 344 (D.Conn.1972).

Besides challenging on its merits defendants' substantive decision to proceed with I–291, plaintiff contends that many procedural aspects of defendants' preparation for that decision failed to comport with NEPA. The Court finds merit in three of plaintiff's contentions of defendants' noncompliance with NEPA's procedural mandates. Each of these contentions relates to the adequacy of the I–291 EIS: the authorship of the EIS, its discussion of alternatives, and its discussion of the impact of I–291 on the air quality and sound levels of land adjacent to the expressway.

### Authorship of the EIS

The title page of the final I–291 EIS states "PREPARED BY THE CONNECTICUT DEPARTMENT OF TRANSPORTATION—BUREAU OF HIGHWAYS—OFFICE OF DESIGN." This accurate representation of the actual authorship of the EIS reflects adherence to the FHWA's November 24, 1970, interim guidelines on compliance with NEPA, see note 56, *supra*. These guidelines directed state highway departments to prepare both draft and final EIS's where such were required by NEPA as a condition to FHWA funding of a highway.[65] PPM 90–1, which superseded the interim guidelines, also leaves preparation of EIS's to state highway departments.[66]

Plaintiff contends that the FHWA, by leaving the writing of the EIS to CONNDOT, failed to comply with the explicit statutory command of NEPA's section 102(2)(C) directing "all agencies of the Federal Government" to include in reports on proposals subject to NEPA "a detailed statement *by the responsible official,*" whom section 102(2)(C) also refers to as *"the responsible Federal official."* 42 U.S.C. § 4332(2)(C) (emphasis added).[67] Were plaintiff's conten-

tion to present a question of first impression, the Court might be free to view the previously catalogued, extensive cooperation of FHWA personnel with CONNDOT personnel in the preparation of the draft and final I–291 EIS's as constituting sufficient compliance with the statutory mandate that the EIS be prepared by personnel of the federal agency charged with compliance with NEPA. But previous case law in this Circuit compels this Court to demand strict compliance with the letter as well as the spirit of NEPA as regards authorship of an EIS.

In Greene County Planning Board v. Federal Power Commission, *supra,* the Second Circuit ruled that the Commission had "abdicated a significant part of its responsibility by substituting the statement of [a state agency] for its own. The Commission appears to be content to collate the comments of other federal agencies, its own staff and the intervenors and . . . to act as an umpire. The danger of this procedure, and one obvious shortcoming, is the potential, if not the likelihood, that the [state agency's] statement will be based upon self-serving assumptions." 455 F. 2d at 420 (footnotes omitted). The court noted that NEPA made consideration of environmental values the "primary and nondelegable responsibility" of the Commission; thus, the court concluded, NEPA required of the Commission "the preparation by *its staff* of its own impact statement . . . ." *Id.* at 420, 422 (footnote omitted, emphasis in original).

In Committee to Stop Route 7 v. Volpe, *supra,* Judge Newman of this Court held that *Greene County* squarely controlled the precise issue here considered. PPM 90–1's provision for state preparation of the final as well as the draft EIS for a federally funded high-

---

65. Interim Guidelines, attached to Defendants' Exhibit A, *supra,* note 56, ¶¶ 5.c, 6.a, 6.c.

66. Plaintiff's Exhibit 12, *supra* note 55, ¶¶ 6.b, 6.i.

67. For the complete text of § 102(2)(C) of NEPA, *see* note 3, *supra.*

way was held to be in irreconcilable conflict with NEPA. Judge Newman noted that *Greene County* did allow state preparation of the draft EIS. "But as to the final version of the detailed statement required by § 102(2)(C), the Court of Appeals ruled unequivocally that this must be prepared by the F.P.C. itself, with the actual work to be done by the agency's own staff." Committee to Stop Route 7 v. Volpe, *supra,* 346 F. Supp. at 741. The FHWA's regulations thus had to give way to "the plain wording of NEPA," *id.,* and federal officials were directed to prepare the final version of the EIS there required.

Another analogous case, Conservation Society of Southern Vermont v. Secretary of Transportation, *supra,* also considered "the very fundamental question whether FHWA procedures requiring preparation of an EIS by the local state highway agency, with communication from and [the] cooperation of the regional FHWA [office], followed by review by an FHWA 'task force' at the regional level complies with NEPA and more particularly NEPA as construed by the Second Circuit Court of Appeals in [*Greene County*]." 362 F.Supp. at 630. Judge Oakes found that the state highway department there concerned was under a legislative mandate to build the highway in issue, and therefore was prone to "self-serving assumptions" in

preparing an EIS, as contemplated by *Greene County.* 362 F.Supp. at 631. Judge Oakes termed the FHWA's review of the final EIS "merely perfunctory, the equivalent of an agency rubber stamp," *id.,* and found the FHWA's role in the preparation of the EIS to have consisted of only "informal chats touching upon the subject, together with [a] field trip and subsequent 'review.'" 362 F.Supp. at 632. Judge Oakes accordingly ruled that the EIS there in issue had not genuinely been "prepared by the responsible federal agency, to wit, the FHWA." 362 F.Supp. at 639.

The facts of the instant case are arguably distinguishable in two respects from the situation confronted by Judge Oakes. Here, the extent of the communication and consultation between CONNDOT and the FHWA seems to have gone beyond the level of informal chats. See pp. 229–230, *supra.* Subordinates of the FHWA Division Engineer were in fairly constant contact with CONNDOT, did do some editing of the *preliminary draft,* and this draft was reviewed in detail by the regional office of the FHWA. FHWA personnel continued to monitor CONNDOT's preparation of the final EIS. Nevertheless, the actual writing of the final EIS was clearly done by CONNDOT personnel, not FHWA personnel, see p. ·230, *supra.*[68] Moreover, there was no

---

68. The limited scope of the FHWA's supervision of CONNDOT's writing of the EIS is well illustrated by defendant Siccardi's responses during cross-examination as to his knowledge of CONNDOT data on I–291's generation of new traffic—data which went unmentioned in the EIS.

"Q. I show you Plaintiff's Exhibit 17 and the attachment, Plaintiff's Exhibit 18, and ask you if that document was brought to your attention, at any time?

That is the document that estimates the 40 percent increase in generated traffic and quotes from the Interstate Traffic Manual.

A. I can only say in—Well, of course, it's November 4th of 1971. I do not know whether I saw this document or not. I really don't.

Q. Don't you think that's a factor that should have been brought to your attention?

A. Well, it's difficult to say, you know. I have a lot of people in my office who—to whom this kind of thing is brought to the attention. Now, this doesn't indicate in fact that it ever came to our office so—

Q. Didn't you testify that you were working rather closely with the state on the preparation of this impact statement?

A. Closely, but certainly not holding their hand on everything they do.

Q. Not so closely that you'd find a projection that said there was going to be a 40 percent increase in traffic?

A. I simply cannot answer your question. I do not know about this particular document."

Siccardi testimony, *supra* note 19, Reporter's Transcript of Selected Excerpts at 3–4. *See also* CONNDOT's Chronology of I–291 Environmental Submissions, attached to Plain-

apparent final "draft" stage which would allow substantive review or editing of CONNDOT's draft of a final EIS by other than the divisional office of the FHWA. The final EIS submitted to the FHWA Division Engineer on February 24, 1972, and forwarded to the regional office four days later, was indeed in final form—*already printed and bound*. While the divisional office of the FHWA had apparently reviewed a draft of the final EIS before it was printed up,[69] the regional office of the FHWA first saw the final EIS in printed form, and thus found itself in a "take it or leave it" posture, with no options other than approval in toto or rejection in toto. This atmosphere is hardly conducive to the detailed review which would be required to transform the CONNDOT final "draft" into the FHWA's own final EIS, and in fact the FHWA regional office's review of the final EIS in the instant case was limited to approval without any alteration.

It must be remembered in this regard that it is the regional, not the divisional level, at which the FHWA has the capability to undertake multi-disciplinary review of an EIS, see p. 230, *supra*. Moreover, PPM 90–1, in effect for over six months before the printed final I–291 EIS was sent to the regional FHWA office, explicitly provides: "FHWA review and acceptance of the final environmental statement shall be the responsibility of the Regional Federal Highway Administrator."[70] Yet the regional office received the final I–291 EIS in so final a form as to allow only complete rejection or "rubber stamp" approval. Thus, in no real sense can the final EIS be said to have undergone such searching review by the FHWA as to make the EIS the FHWA's own product. Rather than resulting from a synthesis of CONNDOT's draft and the FHWA's rigorous review, the final I–291 EIS was written by CONNDOT and merely ratified by the FHWA.

A second arguable distinction between the instant case and *Southern Vermont* is the apparent lack of any legislative requirement that CONNDOT proceed with I–291. But this does not mean that CONNDOT is necessarily disinterested in whether the FHWA agrees to fund I–291. Federal funding for I–291 would serve to reimburse CONNDOT for 90 per cent of the cost of CONNDOT's acquisition of rights of way and other preliminary expenses, see, *e. g.*, 23 U.S.C. §§ 106–108, 120, 124, amounting to several million dollars, see pp. 233–234 *supra*. Moreover, CONNDOT's preparation of the I–291 EIS was primarily the work of highway design engineers, who might well have personal interests in promoting the FHWA's approval of a highway they had already designed, and which they were understandably anxious to see constructed.[71] Thus CONNDOT's perspective may well be far different

tiff's Exhibit 25, *supra* note 21, which contains references such as:

"7–23–71 Following suggestion of FHWA (Turner) preparation of Final ES is begun, based on comments and following the Guidelines in the Federal Register. . . . 8–25–71 Designer starts revisions to Final ES to conform to PPM 90–1. . . . 12–17–71 Designer starts revisions of Final ES to conform to latest instructions from FHWA. (12–16–71 letter from FHWA) [Plaintiff's Exhibit 20]."

69. The I–291 EIS was apparently received in final form by the division office of the FHWA on Feb. 2, 1972, where it was reviewed by a team of three employees of that office, headed by Mr. D. R. Billings. A form bearing the Feb. 2, 1972 "Logged In" date and the initials of the review team also bears the following hand-written comment over Mr. Billings' initials: "Called Art Taylor [of CONNDOT, *supra* note 18] 2/10/72 told him to proceed with printing after checking on the status of the Convalescent home [*see* I–291 EIS, Plaintiff's Exhibit 23, *supra* note 4, at 10]." Defendants' Exhibit G.

70. PPM 90–1, Plaintiff's Exhibit 12, *supra* note 55, ¶ 6.j.

71. In a memorandum of January 18, 1973 to Mr. R. W. Gubala of CONNDOT, attached to Plaintiff's Exhibit 35 (*see infra*), Mr. T. E. Cressey of CONNDOT wrote:

". . . I wish to state the imposition that the present environmental process is placing upon the Design function.

\* \* \* \* \*

from that demanded of an EIS by Congress, which in passing NEPA was "intent upon requiring the agencies of the United States government, such as the defendants here, to objectively evaluate all of their projects, regardless of how much money has already been spent thereon and regardless of the degree of completion of the work." Environmental Defense Fund v. Corps of Engineers, 325 F.Supp. 728, 746 (E.D.Ark.1971). In sum, CONNDOT is just as likely to lard an EIS with "self-serving assumptions" as were the state highway department in *Southern Vermont* and the state power authority in *Greene County*.

I conclude, in accord with *Route 7* and *Southern Vermont*, that PPM 90–1's delegation to state highway departments of primary responsibility for the preparation and writing of EIS's for highway projects proposed for FHWA funding, cannot be squared with *Greene County's* construction of NEPA as requiring that the federal agency charged with compliance with NEPA *itself* prepare the final EIS.[72] Since the final I–291 EIS was

---

With the imminence of preparing environmental statements for all State funded projects in addition to Federally funded projects, it is considered essential that the role of environmental statement production be removed from the basic design team and placed in the hands of specialist personnel, properly qualified, working as a special service unit. To not respond in such a fashion is the alternative of the intolerable lengthening of the period of the design process, obviating all recent advances in design technology. In short, I am asking that the designer be allowed to fulfill his first function—that of preparing construction plans, specifications and estimates."

In a subsequent memorandum to Mr. Gubala, Mr. Cressey again addressed the problem of using design engineers as EIS authors:

"I reiterate that the designer cannot continue to be held responsible for the assembly and preparation of environmental statements without serious consequence. The field of highway design and the field of environmental affairs are too complex and changing too rapidly to be properly absorbed and applied by a person who already carries his full and fair share of responsibility.

The position of crew chief or designer was intended to be occupied by an engineer trained and skilled in highway design to be responsible for the design and coordination of highway projects. To expect him, suddenly and demandingly, to become an environmental writer skilled in the environmental arts and sciences and to keep up to date in the manifold phases of the two disciplines is asking too much."

Memorandum from T. E. Cressey to R. W. Gubala, Feb. 9, 1973, Plaintiff's Exhibit 35.

72. *Greene County* has been tendentiously distinguished by some courts which have permitted federal agencies to delegate the writing of an EIS so long as the delegate has been subject to continuing federal supervision and control. Life of the Land v. Brinegar, 485 F.2d 460, 467–468 (9th Cir. 1973) ; National Forest Preservation Group v. Volpe, 352 F.Supp. 123, 127 (D.Mont. 1972). Other courts have simply ignored *Greene County* in cursorily approving the delegation of EIS authorship. Citizens Environmental Council v. Volpe, 484 F.2d 870, 873 (10th Cir. 1973) ; Finish Allatoona's Interstate Right, Inc. v. Volpe, 355 F.Supp. 933, 937–938 (N.D.Ga.1973).

This Court is, of course, not as free as courts beyond the Second Circuit to play fast and loose with the literal language of *Greene County*. In any event, I am not persuaded that FHWA supervision and control of state EIS writers is sufficiently amenable to judicial review to make case-by-case evaluation of the FHWA's influence on an EIS preferable to *Greene County's per se* rule of invalidation of a state-authored EIS. The *per se* rule, if applied by all circuits, would lead to appropriate agency regulations on EIS authorship and would shift the initial burden of monitoring compliance with this aspect of NEPA to the agencies themselves, while facilitating ultimate judicial evaluation of such compliance. Since the case-by-case approach requires judicial findings in every case as to the degree of federal agency control over state authors, it tends to encourage even more NEPA litigation, while at the same time increasing the chance that a legally insufficient EIS might for lack of litigation become the basis for federal decisions made in ignorance of potentially disastrous environmental consequences. The prevalency of *Greene County's* "self-serving assumptions" in the I–291 EIS, see pp. 248–249, 252–254, *infra*, suggests that any delegation

prepared in accordance with the PPM 90–1 policy of state authorship, there appears to be a strong probability that defendants would be found in non-compliance with NEPA on this point at a trial on the merits of plaintiff's complaint.

*Alternatives*

[redacted] In assessing whether the I–291 EIS adequately complies with the procedural mandates of NEPA, the Court has the benefit of the Second Circuit's own capsulization of the relevant inquiry, framed in the identical context of an FHWA highway funding decision: "The primary purpose of the impact statement is to compel federal agencies to give serious weight to environmental factors in making discretionary choices . . . . It is, at the very least, 'an environmental full disclosure law' . . . for agency decision makers and the general public. In light of this, the Secretary of Transportation was bound fully to comply with the requirements of the statute, and mere token efforts in that direction do not suffice." Monroe County Conservation Council v. Volpe, *supra,* 472 F.2d at 697 (citations omitted). There are many aspects to the adequacy of an EIS, of course, but the "requirement for a thorough study and a detailed description of alternatives," see §§ 102(2)(C)(iii), 102(2)(D) of NEPA, 42 U.S.C. §§ 4332(2)(C)(iii), 4332(2)(D), "is the linchpin of the entire impact statement." Monroe County Conservation Council v. Volpe, *supra,* 472 F.2d at 697–698 (footnote omitted).

Of the 28 pages of the I–291 EIS, one quarter fall under the section headed "Alternatives." Even these seven pages represent a seven-fold increase over the discussion of alternatives in the preliminary draft of the EIS,[73] which in a single page asserted that since I–291 "is an entirely new project" its traffic service could not be provided by modernization of existing streets and highways, hence "our alternates [sic] are either to build the facility or not to build it at all."[74] The preliminary draft went on to dismiss not building I–291 as "not a reasonable and prudent alternate" because it would result in increasing traffic congestion in the area and lead to economic loss.[75] The preliminary draft concluded that even after the construction of I–291 traffic growth would exceed its capacity; however, I–291 would then be useful as a medium for mass transit by motorized buses through establishment of exclusive bus lanes.[76]

The preliminary draft's one-page section on alternatives was criticized by both the division office of the FHWA[77] and the Connecticut Office of State Planning.[78] Yet the seven-page section

of authorship of an EIS to state officials is likely to sabotage the Congressional goal of an objectively written EIS. Thus the *per se* approach of *Greene County* seems more consistent with the intent of Congress than the case-by-case approach of courts in other circuits, as well as being more consistent with the text of NEPA, and more conducive to efficient administrative and judicial enforcement.

73. Plaintiff's Exhibit 10, *supra* note 16.

74. *Id.* at 10.

75. *Id.* at 11.

76. *Id.*

77. "It is our feeling that the draft statement could have been strengthened by a better discussion of the alternative locations studied and the reasons why the proposed alignment was selected over those discarded. This weakness has been noted in many of the draft EISs prepared by other States as well. In this instance the 4(f) statements contain excellent discussions of alternative locations complete with maps. We feel that a condensed version of this information should be included in the final EIS with reference to the availability of the 4(f) statement should anyone seek more complete information."

Memorandum from A. J. Siccardi to A. E. Wood, Commissioner of CONNDOT, July 21, 1971, I–291 EIS, Plaintiff's Exhibit 23, *supra* note 4, Appendix I.

78. "*Alternatives to the proposed action.* Without finding fault with the proposed design for I–291, I think a fair interpretation of the National Environmental Policy Act (1969) would warrant more than one page to a discussion of alternatives. To say, as the Statement goes, that 'our al-

on alternatives in the final EIS retains many of the flaws of its predecessor. The final EIS does follow the FHWA's suggestion that material from the "4(f)" statements required under section 4(f) of the Department of Transportation Act of 1966, 49 U.S.C. § 1653(f), relating to alternatives to the taking of publicly-owned open space, be incorporated in the I–291 EIS. Thus four of the seven pages discuss various alternative routes within the same general corridor, justifying the rejection of these alternatives on the basis of economic cost, displacement of housing or businesses, other important existing land uses, and safety factors.[79] Another page notes that the location of the general corridor for I–291 has been a matter of "general public knowledge" since "the late 1950's," and hence "existing development patterns precluded anything but minor adjustments to the original concept."[80] It is apparently on this premise that, aside from the four-page discussion of "minor adjustments," the EIS considers only three alternatives to I–291 as currently proposed.

Like the preliminary draft, the final EIS dismisses in a conclusory paragraph the alternative of improving existing streets: "It is unrealistic to believe that modernizing the existing network could greatly improve traffic flow. The high development of lands adjacent to these roads, the numerous side road intersec-

tions, the devious routes followed and the extremely high cost make this alternative impractical."[81] No data whatsoever is produced to support these conclusions.

The alternative of abandoning plans for construction of I–291, termed the "do-nothing" alternative by the EIS, is given even shorter shrift, again echoing the criticized preliminary draft: "This could only lead to increased congestion on the highways through Newington in particular and to some degree in the other affected Towns. Since this congestion would cause increased economic loss to the Towns and to all potential users of the facility this does not appear to be a reasonable and prudent alternate."[82] No data is offered as to existing or projected traffic congestion, or as to economic loss.

The final alternative considered is mass transit. The need for mass transit facilities is admitted, but from two statistics on projected travel patterns along I–291[83] the EIS concludes that it "can readily be seen" that the origins and destinations of traffic along I–291 will be so diffuse as to require the "extreme flexibility" of I–291 as opposed to "any mass transit system."[84]

NEPA's requirement for discussion and consideration of alternatives "seeks to ensure that each agency decision maker has before him and takes into proper account all possible approaches to a par-

ternatives are either to build the facility or not to build it at all' is, in my opinion, totally inadequate. Section 102(2)(D) of that Act requires the responsible agency to 'study, develop and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources.' This applies to I–291 quite clearly; a description of real alternatives should be added to the draft."

Memorandum from Bill Cox, Connecticut Office of State Planning (OSP), to George Kiefer, OSP, July 29, 1971, I–291 EIS, Plaintiff's Exhibit 23, *supra* note 4, Appendix I.

79. I–291 EIS, Plaintiff's Exhibit 23, *supra* note 4, at 20–24.

80. *Id.* at 19–20.

81. *Id.* at 19.

82. *Id.* at 24.

83. "[A]nalysis of auto travel patterns on segments of Interstate 291 shows that eighty-three per cent of the traffic on the Interstate 291 segment between the New Britain Connector to Interstate 91 interchange in Rocky Hill has at least one trip end within the following towns: Newington, New Britain, Berlin, Rocky Hill and Wethersfield. Twenty-one per cent of traffic using this section have both origin and destination in adjacent towns (Newington, New Britain, Berlin, Rocky Hill and Wethersfield)."

*Id.* at 25.

84. *Id.*

ticular project (including total abandonment of the project) which would alter the environmental impact and the cost-benefit balance. Only in that fashion is it likely that the most intelligent, optimally beneficial decision will ultimately be made. Moreover, by compelling a formal 'detailed statement' and a description of alternatives, NEPA provides evidence that the mandated decision making process has in fact taken place and, most importantly, allows those removed from the initial process to evaluate and balance the factors on their own." *Calvert Cliffs', supra,* 449 F.2d at 1114. The Second Circuit has built on *Calvert Cliffs'* to read NEPA as demanding, as part of the aforementioned "thorough study and a detailed description of alternatives," that "[c]onsideration . . . *must* . . . be given to the feasibility and impact of the abandonment of the project." *Monroe County Conservation Council v. Volpe, supra,* 472 F.2d at 697, 698 (emphasis added). Mere "passing mention of possible alternatives to the proposed action . . . in . . . a conclusory and uninformative manner" renders an EIS fatally inadequate. *Id.* at 697. In a similar vein, the First Circuit has indicated that in its discussion of alternatives "the agency must go beyond mere assertions and indicate its basis for them." *Silva v. Lynn, supra,* 482 F.2d at 1287.

Even as to the alternatives it does discuss, the I–291 EIS falls far short—on its face, as it were—of the required "thorough study and . . . detailed description." No reasoned decision could be made on the basis of the EIS that departure from the expected corridor is precluded by speculative development, that modernization of existing highways is too costly, that mass transit is too inflexible to serve public needs, or that abandonment of the project is impractical. These difficult judgments have been committed by NEPA to the informed discretion of the FHWA and ultimately the Secretary of Transportation—yet rather than provide information, the EIS provides only "generalities and heavy-handed self-justifications." *Brooks v. Volpe,* 350 F.Supp. 269, 278 (W.D.Wash.1972). The EIS treats the crucial decision to proceed with federal funding of I–291 not as an impending choice to be pondered, but as a foregone conclusion to be rationalized.

In addition to its conclusory treatment of the alternatives which it does mention, the I–291 EIS also suffers from a failure to articulate at all at least two plausible alternatives to I–291 as presently conceived.

The first of these alternatives, as explained by Mr. Robert L. Morris, a traffic engineer and transportation planning consultant who testified as an expert for plaintiff, would be to use existing State Routes 9 and 72 as the basis for linking I–91 with I–84.[85] State Route 9 is an expressway which presently proceeds from exit 69 of the Connecticut Turnpike (I–95) near the mouth of the Connecticut River northwesterly through Middletown to join I–91 at exit 22–S, approximately three miles south of the proposed intersection of I–291 and I–91. CONNDOT has tentative plans, State Project 33–83, to construct an extension of Route 9 approximately four miles west of I–91 to join Route 72 at the Berlin Turnpike. There already exist at the junction of I–91 and Route 9 the ramps and landscaping necessary to transform the junction into an interchange by which Route 9 crosses I–91 and continues on to the west. Route 72 has previously been improved into an expressway from its intersection with the Berlin Turnpike west to the New Britain city limits. Mr. Morris suggested that construction through New Britain of a further two or three miles of expressway would connect Route 72 to the New Britain Expressway, a spur off of I–84, and hence complete an expressway link from I–91 to I–84 roughly parallel to, and three to five miles south of, the

85. Testimony of Robert L. Morris, Nov. 30, 1973.

proposed route of I–291. Such a connection of the Route 72 expressway to the New Britain Expressway is apparently already under contemplation by CONN-DOT, since the present plans for I–291 show an interchange with a "Route 72 connector" which would, it seems, proceed south from I–291, near the New Britain-Newington boundary, through an interchange with the New Britain Expressway, to link up with the present end of Route 72 as an expressway at the New Britain city limits.[86]

The second unmentioned alternative to I–291 as presently conceived was proposed by defendant Siccardi himself. In a memorandum dated Oct. 7, 1971 to Mr. G. D. Love, defendant White's predecessor as Regional Administrator of the FHWA, defendant Siccardi noted that the FHWA had relegated I–291 to an indeterminate status pending approval of the preliminary draft "4(f)" statements required under 49 U.S.C. § 1653(f) for the taking of open space for I–291's right-of-way, and because of uncertainty as to the location of I–291 north of I–84.[87] I–291 was originally supposed to be a circumferential beltway from I–91 south of Hartford clockwise through I–84 west of Hartford and I–91 north of Hartford to I–86 northeast of Hartford, but political opposition to the proposed route of I–291 north of I–84 had raised the prospect that I–291 would be confined to a link between I–84 and I–91. Defendant Siccardi thus wrote in his October 7th memorandum:

"As I view the situation, it appears to me that if I–291 were not constructed north of I–84 the indirection of I–291 as a circumferential, particularly between I–84 and the New Britain Expressway, raises a question as to whether or not this segment should be Interstate. A more reasonable routing would be I–84-New Britain Expressway—I–291 through Newington to I–91. A review of the traffic data supports the need for I–291 as a relief for I–84 which is currently operating over capacity. Furthermore, if the State is going to meet the dates included in the 1970 Highway Act some steps are going to be necessary to permit the State to proceed with design and acquisition of critical sections.

Accordingly, I am recommending the following courses of action:

1. That FHWA approve the section of I–291 from the New Britain Connector eastward to I–91. This would permit the options of continuing I–291 northward if the location problems are ultimately resolved, tying into the New Britain Expressway and ultimately I–84 in a more realistic Interstate alignment for the Southern circumferential, or, as a last resort, serve as a spur connection [to] I–91 in this highly urbanized area.

2. That FHWA take actions necessary to have the Churchill Park 4(f) released which would permit this office to advance this segment of the project. This 4(f) is not controversial in fact the Town has submitted a letter wherein they urge rapid progress on the construction of the route."[88]

86. See, e. g., I–291 EIS, Plaintiff's Exhibit 23, supra note 4, Figure 2. See also the references to a "New Britain Connector" in note 83, supra, and to a "Route 72 Connector" in note 92, infra.

87. Defendants' Exhibit C. This memorandum is also attached to Plaintiff's Exhibit 15, a memorandum from J. M. O'Connor of the Washington office of the FHWA to Mr. Love as Regional Federal Highway Administrator, Oct. 13, 1971.

88. Defendant Siccardi's proposal arose from concern in the office of the Secretary of Transportation that an EIS should be prepared for the entire proposed I–291 beltway from I–91 all the way to I–86. In a memorandum of July 29, 1971 [attached to Plaintiff's Exhibit 11, infra], to G. R. Turner, who had by that date already left his post as the FHWA Division Engineer for Connecticut, Herbert DeSimone, the Assistant Secretary of Transportation for Environment and Urban Systems, noted his office's receipt of the preliminary draft EIS and 4(f) statements for I–291. Because of the "highly controversial" nature of I–291 north of I–84, Mr. DeSimone indicated that

It is true that a "rule of reason is implicit" in NEPA's requirement that an EIS describe and discuss alternatives to proposed agency action. Natural Resources Defense Council v. Morton, 148 U.S.App.D.C. 5, 458 F.2d 827 at 834. While this "rule of reason" was originally formulated in reference to NEPA's requirement of discussion of the environmental *effects* of *stated* alternatives, especially "when these effects cannot be readily ascertained and the alternatives are deemed only remote and speculative possibilities," *id.*, at 838, it has since been applied to the more basic question whether certain alternatives had even to be described in an EIS, let alone discussed. See Life of the Land v. Brinegar, 485 F.2d 460, 472 (9th Cir. 1973).

Even under this broad view of the "rule of reason" under NEPA, however, the omission of any mention in the I-291 EIS of the Route 9-Route 72 and

his office would take no action on the draft EIS and 4(f) statements until they were expanded to include all of I-291, north as well as south of I-84. In response to the De-Simone memorandum, the regional office of the FHWA wrote a memorandum dated Aug. 6, 1971, to Mr. M. Lash of the FHWA's Office of Environmental Policy in Washington.

"While we agree that it is generally desirable to have Environmental Impact Statements cover a complete route or a substantial portion of a route in rural area, this procedure is not practical in a complex urban area. In the particular case under discussion the limits for the EIS for I-291 were established on the basis of sections which could stand on their own merit. The section of I-291 through Newington from its interchange with I-84 (the construction of which has been completed) and I-91 is a route section which will provide valuable traffic service to the Hartford area. The utility of this section of highway does not depend on the approval of the remainder of I-291, also the approval of this section will have no influence on the location of I-291 through West Hartford or Bloomfield.

On this basis the Assistant Secretary for Environment and Urban Systems should proceed with the review and processing of the subject EIS and 4(f)." Plaintiff's Exhibit 11.

It was apparently in further response to Mr. DeSimone's memorandum that defendant Siccardi proposed proceeding just with the Route 72 Connector—I-91 portion of I-291. Unbeknownst to defendant Siccardi, however, a further exchange of memoranda had taken place after the August 6th memorandum. On Aug. 25, 1971, the Washington office of the FHWA sent a memorandum to Mr. DeSimone [attached to Plaintiff's Exhibit 21, *infra*] repeating verbatim the rationale expressed by the regional office in its Aug. 6th memorandum to Mr. Lash, as to deciding on I-291 south of I-84 independently of I-291 north of I-84. This Aug. 25th memorandum resulted in the following memorandum [attached to Plaintiff's Exhibit 21, *in-fra*] dated Sept. 8, 1971, from Mr. De-Simone to the Washington office of the FHWA:

"Thank you for your memo of August 25, 1971, supplying our office with additional information on the portion of I-291 through Newington from its interchange with I-84 to I-91. The information is very helpful in clarifying the status of this controversial project.

Since you indicate that the approval of this section will not result in a commitment to a route location of I-291 through the West Hartford-Farmington-Bloomfield area, we shall proceed with our review process when we receive the final environmental impact statement and Section 4(f) findings for this project as a route which will, in itself, provide traffic service to the Hartford area."

Defendant Siccardi's Oct. 7th memorandum was forwarded to the Washington office of the FHWA by the Regional Administrator, G. D. Love, in a memorandum dated Oct. 13, 1971 [Plaintiff's Exhibit 15, *supra* note 87], together with a reference to his office's Aug. 6th memorandum to Mr. Lash and a further request that the Washington office expedite the processing of the preliminary draft EIS and 4(f) statements for I-291 south of I-84. In reply to his Oct. 13th memorandum, the Washington office of the FHWA sent Mr. Love a memorandum dated Dec. 17, 1971 [Plaintiff's Exhibit 21], attaching copies of the Aug. 25th and Sept. 8th memoranda exchanged by Mr. DeSimone and the Washington office of the FHWA, and indicating on the basis of these memoranda that Mr. Love could proceed with preparation of a final EIS/4(f) statement for I-291 as described in the preliminary draft EIS. Thus the Washington office of the FHWA made no response to defendant Siccardi's proposal to construct only the Route 72 Connector—I-91 portion of I-291, and instead indicated its willingness based on the Aug. 25th and Sept. 8th memoranda to proceed with I-291 as originally proposed, at least insofar as the I-91 to I-84 segment was concerned.

the Siccardi alternatives clearly constitutes non-compliance with NEPA. Certainly the FHWA in reviewing the EIS knew or should have known of each alternative, since one was proposed by the Division Engineer himself,[89] and the other is immediately suggested by a glance at CONNDOT's own Connecticut highway map which is available to the public without charge and which shows the proposed and already constructed portions of the entire Route 9-Route 72-New Britain Expressway link between I–91 and I–84.[90] Neither alternative appears to be so prima facie unreasonable as to warrant its exclusion from the EIS. The Route 9-Route 72 alternative would seem to be technically feasible, since part of that proposed link between I–84 and I–91 has already been built, and much of the remaining portion is already at the design stage. The same holds true of the Siccardi proposal. It may be that each alternative would serve primarily the single purpose of linking I–84 to I–91, while I–291 ostensibly serves other purposes besides linking I–84 to I–91—providing a part in the circumferential beltway around metropolitan Hartford, and relieving traffic congestion in Newington and surrounding areas.[91] But "single purpose" alternatives must nevertheless be described and discussed in the EIS for a multi-purpose project, at least where the single purpose served is significant. See Environmental Defense Fund v. Corps of Engineers, 325 F.Supp. 749, 762 (E.D.Ark. 1971).

 Of course, it does not follow that because each alternative is reasonable, it is therefore preferable to I–291 as presently proposed. There may well be major disadvantages to implementation of either alternative. What NEPA demands is that the EIS be sufficiently inclusive and informative in its description and discussion of alternatives to I–291 to allow the Secretary of Transportation and his delegates to make an informed choice to proceed with I–291 *vel non*.[92] Rather than inform federal deci-

89. Since it was set forth in an intra-agency memorandum before the writing of the final EIS, the Siccardi proposal is arguably required for inclusion in the final EIS not only as an alternative to I–291 but also as an agency comment on the preliminary draft EIS which must "accompany the proposal through the existing agency review processes." Section 102(2)(C) of NEPA, 42 U.S.C. § 4332(2)(C). *See* Committee for Nuclear Responsibility v. Seaborg, 149 U.S. App.D.C. 385, 463 F.2d 788, 794 (1971).

90. "Map of Connecticut," CONNDOT, Plaintiff's Exhibit 49.

91. I–291 EIS, Plaintiff's Exhibit 23, *supra* note 4, at 4.

92. Information on the Siccardi alternative was especially essential to an adequate I–291 EIS because implementation of that alternative would spare the threatened open space area in Eagle Lantern Village, which lies across the portion of I–291 from I–84 southeast to the Route 72 Connector. The I–291 EIS adverts to the taking of the Eagle Lantern Village open space as an "unavoidable adverse affect [sic]" of I–291, and refers to the 4(f) statement appended to the EIS. Neither the EIS nor the 4(f) statement mention the Siccardi alternative. That the Siccardi alternative would have been of considerable interest to those to whom the final I–291 EIS was circulated, is demonstrated by the following comments of the Department of Interior:

"This is in response to your letter of May 3, 1972, requesting the Department of the Interior's comments on the final environmental/Section 4(f) statement for the segment of I–291 between I–91 and I–84 in Hartford County, Connecticut.

*Based on the information provided*, there appears to be no feasible and prudent alternative to the proposed highway location. This conclusion has been reached by comparing the environmental effects of each alternative considered and the project sponsor's ability to minimize harm to the affected Section 4(f) lands.

This Department is concerned about two recreation areas involved in this project, the Eagle Lantern Open Space property and the Churchill Park. . . .

\* \* \* \* \*

This project will include the construction of a *Route 72 Connector*. The inclusion of such a connector represents, in part, a decision in principle about the future construction of Route 72 and also will act as a control point for a portion of its alignment. Field contacts have indicated that Route 72 will be entirely State funded. Additionally, it appears that Route 72 has

sion makers, by objectively listing the alternatives facing them regarding I-291 and supplying facts sufficient for them to judge the merits of each alternative, this EIS usurps the Secretary's decision making role by framing its discussion of alternatives so that, based on the EIS alone, only one decision is possible—to proceed with I-291 as presently planned. Thus the EIS caters to just the sort of tendentious decision making that NEPA seeks to avoid.

I conclude that there is a strong probability that plaintiff would prevail at a trial on the merits of its contention that the I-291 EIS is inadequate in its description and discussion of alternatives.[93]

### Noise and Air Quality Impacts

To be discussed under this heading are the adequacy of the consideration given to noise and air quality impacts in the original I-291 EIS, the adequacy of the post-EIS noise and air quality studies as remedies for any defects in the original I-291 EIS, and whether defendants' consideration of the post-EIS

studies was in accord with the procedural and substantive mandates of NEPA.

The treatment of noise and air quality impacts in the I-291 EIS is both cursory and conclusory. Only two out of the 28 pages in the EIS dealt with noise pollution, but a single paragraph with air pollution. The EIS notes that embankments and other landscaping features have been designed into the highway to reduce visual and noise pollution in sensitive areas,[94] then states that "[a] summarization in advance of the actuality of I-291 can only be, at best, careful examination and projection,"[95] but nevertheless provides no data whatsoever on the expected volume of traffic along I-291 and the noise expected to be generated thereby. Rather, the EIS sums up its consideration of noise pollution with this unabashedly justificatory passage: "A high-type highway occupying a new corridor will obviously introduce a new character and level of sound. Accordingly, this report would conclude that the sound emanation along I-291 would not be of a magnitude sufficient to be noisome to those near enough to hear it.

advanced through the design stage with no opposition based on environmental issues. Although this may be the case, the environmental statement was seriously inadequate in that it did not discuss such information. Under these circumstances, *the environmental effects of the connector road should be discussed* or the construction of ramp connectors should be deleted from the project."
Letter from W. W. Lyons, Ass't. Secretary of the Interior, to F. C. Turner, Federal Highway Administrator, June 15, 1972, attached to a handwritten memorandum on the letter initialed by defendant Siccardi and dated June 30 (1972), Plaintiff's Exhibit 27 (emphasis added).

In bypassing the Eagle Lantern Village open space, the Siccardi alternative would also eliminate the principal noise problem along I-291, *see* note 28, *supra*, as well as spare a small waterfall, the Barbour Road Falls, just south of the open space area. *See generally* Affidavit of Lauren Brown, Plaintiff's Exhibit 56.

93. Plaintiff also claims that the EIS is inadequate for failing to reflect the controversy which has arisen regarding the construc-

tion of I-291 north of I-84. Plaintiff asserts that the EIS erroneously assumes that I-291 will indeed be constructed north of I-84, and hence presents I-291 south of I-84 in a false light as part of a circumferential beltway, a function which plaintiff argues is unlikely ever to be served by I-291. Plaintiff appears to concede that the beltway concept of I-291 was not shelved until after the preparation of the final I-291 EIS, and limits its claim on this point to the failure of defendants to supplement the EIS with a statement as to the current posture of I-291 north of I-84. Defendants appear to concede that the future of I-291 north of I-84 is uncertain, but argue that a supplemental EIS on this point is unnecessary in view of I-291's utility independent of the possibly defunct beltway. Since the prospects for I-291 north of I-84 must in any event be discussed in the revised EIS's consideration of the Siccardi alternative, I need not decide whether such a discussion might otherwise be required in order for the EIS to be in compliance with NEPA.

94. I-291 EIS, Plaintiff's Exhibit 23, *supra* note 4, at 14–16.

95. *Id.* at 16.

Considerable detail to abate sound reflection along sections of I–291 give the proposal merit by way of designed-in ways to attenuate the sound factor." [96]

The consideration in the EIS of the impact of I–291 on air quality consisted entirely of this paragraph: "No highway in itself can reduce air pollution from vehicle emissions. There is no question that some of the areas of the town traversed will have the intrusion of heavier traffic. Considering the region as a whole, however, it is within the realm of reason that a completed highway system will greatly reduce traffic volumes in other critical pollution areas. It is a fact that efficiently moving traffic emits far less pollutants than the same number of vehicles slowly moving on congested streets." [97] Unlike the noise pollution portion of the EIS, which was added at the time the final draft of the EIS was prepared, and which was based at least in part on CONNDOT traffic projections for I–291,[98] the air pollution portion was carried over verbatim from the unresearched rough draft of the preliminary EIS.[99] The author of that rough draft, defendant Koch, admitted at the hearing on plaintiff's motion that this draft was written "off the top of my head" without the support of any empirical data.[100]

As was noted in Brooks v. Volpe, *supra,* 350 F.Supp. at 276, the CEQ has itself declared that "[t]he environmental impact study may not 'be used as a promotional document in favor of the proposal, at the expense of a thorough and rigorous analysis of environmental risks.'" In the same case the court ruled that an EIS for an interstate highway was inadequate, because of "a serious lack of detail" and reliance "on conclusions and assumptions without reference to supporting objective data." *Id.* at 277. As an example of such defects, the court quoted the EIS's discussion of air and noise pollution, which was somewhat *more* detailed, at least in respect to air pollution, than the I–291 EIS. See *id.* at 277–278, n. 34. In Lathan v. Volpe, 350 F.Supp. 262, 266 (W. D.Wash.1972), the same court invalidated another freeway EIS for, *inter alia,* "inadequately describ[ing] the detrimental effects of air pollution on people (e. g., residents and drivers) in the vicinity of the corridor" and "fail[ing] to back up its conclusions on noise pollution with scientific data or reference to specific studies . . . ." In yet another freeway case in which no EIS at all had been prepared, the court held that "failure to closely examine the effect of the proposed freeway on air pollution was an egregious omission," and

96. *Id.*

97. *Id.*

98. Taylor testimony, *supra* note 18.

99. Defendants' Exhibit F, *supra* note 11.

100. Defendant Koch testified as follows during redirect examination by defendants:
"Q. Just one quick question, Mr. Koch. There is an allegation in the complaint that the preliminary research for the draft was just done without any backup data; so to speak, off the top of your head. Can you comment on that?
A. Well, it all depends upon what you refer to as 'off the top of my head'.
At the time I prepared this I had been doing highway engineering for some 25 years. I am well aware of the consequences of construction of highways.
As I said, I personally had conducted the public hearings on this. I knew every concern that had been expressed at those

public hearings. I also met with every group that asked for a meeting in this particular area, reacted to the complaints or concerns that these people might have, and revised the project to meet the needs of the highway, the safety requirements of the highway, and to minimize the concerns of the people.
And from that background, yes, you can say I wrote it off the top of my head. But it was thorough and complete knowledge of this project from one end to the other.
Q. It's based on your research too, isn't it?
A. My experience, of course, in the 25 years is constant research because we are in a constantly changing climate in terms of all activities that impinge on the human environment." Koch testimony, *supra* note 13, Reporter's Transcript of Selected Excerpts at 7–8.

also demanded a "thorough examination . . . of the relationship between the freeway and noise pollution." Keith v. Volpe, 352 F.Supp. 1324, 1334, 1335 (C. D.Cal.1972), partially rev'd on other grounds sub nom. Keith v. California Highway Commission, No. 72–3072 (9th Cir., Dec. 3, 1973).[101]

Defendant Siccardi testified that he regarded the EIS's discussion of noise and air quality impacts as qualitative rather than quantitative. However, this

qualitative characteristic caused him "[n]o dissatisfaction . . . whatever" with the EIS.[102] As indicated in his memorandum requesting additional noise and air quality studies, he based his request on advances in air quality and noise evaluation technology since the writing of the EIS. See note 26, *supra*.

Even assuming that substantial technological progress did occur between the time of CONNDOT's submission of the

101. Keith v. Volpe was especially concerned with the EIS's consideration of air pollution because "[a]ir pollution in the Los Angeles basin is particularly obnoxious, and the major cause of it is automobile emission." 352 F.Supp. at 1334. Hartford apparently has less air pollution than Los Angeles, primarily because of better dispersal by prevailing winds. Testimony of Dr. Robert R. Hippler, Nov. 28, 1973. Nevertheless, the post-EIS air quality study of which Dr. Hippler was the principal author, states: "The proposed highway is to be located in Farmington, New Britain, Newington, Wethersfield and Rocky Hill, a part of Connecticut's Hartford-New Haven-Springfield Interstate Air Quality Control Region. The AQCR is presently classified as Priority I by EPA for CO, $NO_2$ and oxidants." Air Quality Study, Plaintiff's Exhibit 39, *supra* note 30, at 40. The State of Connecticut's Air Quality Implementation Plan, Defendants' Exhibit D, discloses that the AQCR in which I–291 is situated is classed as Priority I not only for the three pollutants mentioned above but also for particulates and sulphur dioxide. Connecticut Air Quality Implementation Plan at 51, Table 3–6. The Plan states that "Priority I regions are the most heavily polluted, with levels well above the national standards . . . . ." *Id.* at 49.

102. Defendant Siccardi testified as follows during cross examination by plaintiff:
"Q. Now, I understand from your testimony, Mr. Siccardi, that you did grant design approval—
A. Yes sir.
Q. —to this section of highway. And I believe your testimony was that you granted design approval on November 11, 1972?
A. Thereabouts. I'm not sure of the exact date.
Q. Now, at that time, according to your testimony, you were dissatisfied—
A. No, I did not say that, I did not say I was dissatisfied.

Q. I believe you testified that the only noise and air studies that had been made had been qualitative, was that your word?
A. I did say that, yes.
Q. What does that mean to you?
A. It means that they're based upon experience, they're based upon other than quantitative data. They're qualitative in nature. They're perceptions, perhaps, of the writer. That's what—Yes, that's right.
Q. All right. Now, you wished quantitative data, is that correct?
A. I knew that quantitative data could be gotten and, therefore, I requested that some quantitative data be obtained.
Q. And that request was made, if I understand correctly, on the same day that you approved the design approval?
A. Yes. And it was done purposely on the same day. But it was done in a separate document.
Q. May I ask why, if you felt there should be more quantitative data, you approved the design at that time?
A. You may. And I think I tried to answer that question. There is a period of time between design approval and the final plan specification and estimate in which additional work must be done on any project.
I viewed noise and air just the same as I would the curvature of a highway or anything else. I simply said qualitative data before me indicates that there is no adverse impact on air or noise.
I would like to see, before I approve the final plan specification and estimate, some quantitative data upon which I could base my judgment as to whether the qualitative data or the qualitative judgment is a good or not a good judgment.
Q. All right.
A. No dissatisfaction indicated whatever with the environmental impact statement." Siccardi testimony, *supra* note 19, Reporter's Transcript of Selected Excerpts at 1–3.

final EIS to the FHWA in February, 1972, and defendant Siccardi's granting of design approval in November, 1972, this cannot excuse the complete lack of quantitative data in the EIS. For one thing, it has already been noted that the air pollution paragraph of the EIS was derived verbatim from the initial rough draft written by defendant Koch during or before February, 1971. If technological progress was occurring, it should have been reflected by revision of the EIS in the year between its rough draft and its submission in final form. Even more important, whatever the state of the art in February, 1972, or even February, 1971, it was not so primitive as to allow only the superficial consideration accorded air pollution by the EIS. A purely qualitative discussion of air pollution simply does not constitute compliance with NEPA. "As long as some information on air pollution was available, NEPA and the [CEQ's] guidelines obligated the federal defendants to prepare a Section 102(2)(C) statement examining with as much precision as was possible at the time, the impact of the proposed freeway on air quality . . . ." Keith v. Volpe, *supra,* 352 F.Supp. at 1335. It is indisputable that at least "some information on air pollution was available" to the authors of the EIS—on April 30, 1971, the EPA published in the Federal Register copious air quality standards and details of measurement techniques. 36 Fed.Reg. 8186 et seq.

I conclude, at least on the evidence before me on plaintiff's motion for a preliminary injunction, that the I–291 EIS gave inadequate consideration to the potential noise and air quality impacts of I–291. It remains to consider whether there is merit in defendants' contention that any such inadequacy of the EIS was cured by the subsequent air quality and noise analyses.

Such a cure appears to be possible. Citizens for Mass Transit v. Brinegar, 357 F.Supp. 1269 (D.Ariz.1973), concerned several portions of a proposed interstate highway. Plaintiffs asserted that the July, 1971 EIS for one portion was inadequate for lack of specific detail, particularly in its discussion of the demographic and air quality impacts of the proposed freeway, and in its treatment of alternative alignments. In response to the plaintiffs' attack, the defendants prepared a supplemental EIS. Since the plaintiffs failed to make any "specific allegation of a deficiency in the final Supplement to the EIS," the court declined to decide "[w]hether the specific deficiencies alleged by plaintiffs for the original EIS in fact cause an insufficiency of detail for that statement . . . . That question is moot by reason of the supplemental statement, and therefore this Court holds that no violation of NEPA has occurred . . . ." 357 F.Supp. at 1275.

The crucial point in *Citizens for Mass Transit* is that the supplemental EIS there concerned was just that—a supplemental EIS which was prepared in prima facie compliance with NEPA and PPM 90–1, and hence was circulated in draft form for comment by federal, state, and local agencies before being submitted in final form for FHWA review and ultimate approval by the Secretary of Transportation.[103] Even assum-

---

103. "[W]hen the Fifth Amended Complaint in this case was filed on September 5, 1972, a draft supplement to the EIS was prepared by the Arizona Highway Department. This supplement purports to comply with the Department of Transportation PPM 90–1 (1971) which provides administrative guidelines for implementation of Section 102(2)(C) of NEPA, 42 U.S. C.A. § 4332(2)(C). The supplement was circulated for comment among some twenty-three federal, state, and local govern-

mental and private agencies, and additional comments were received from six other groups or agencies. All these comments, including at least one by the chairman of plaintiff CMTAF, were included in the final supplement to the EIS. This supplement was approved by the Secretary of Transportation on February 14, 1973." Citizens for Mass Transit v. Brinegar, *supra,* 357 F.Supp. at 1274.

Of course, under the law of the Ninth Circuit the supplemental EIS was not invalid

ing, *arguendo*, that the post-EIS studies of I–291's impacts on air quality and sound levels were prepared by the FHWA itself, as required of an EIS in this circuit, see pp. 243–247, *supra*, these studies were handled entirely outside of the channels established by NEPA and PPM 90–1 for processing an EIS, despite the express mandate of PPM 90–1 that "A supplemental statement is to be processed in the same manner as a new environmental statement." [104] They were not circulated in draft form for comment by interested agencies, nor were they ever sent for review and approval, in draft or final form, to even the regional office of the FHWA, let alone the Washington office of the FHWA and the office of the Secretary of Transportation. The post-EIS I–291 noise and air quality studies were never regarded by the FHWA as anything but an individual initiative of defendant Siccardi.[105]

While this initiative on the part of defendant Siccardi is most commendable, and is a token of the good faith which the Court finds manifest in all the actions of defendants in regard to the issues *sub judice*, defendants cannot at the last moment transform this initiative into a remedy for the inadequacies of the underlying original EIS. The requirements of circulation for comment and forwarding for "front office" review of an EIS, supplemental or otherwise, are no mere technicalities. The circulation and review requirements are critical features of NEPA's effort to insure informed decision making by providing procedural inputs for all responsible points of view on the environmental consequences of a proposed major federal action. Thus NEPA requires ·

because it was prepared by the state rather than by the FHWA. *See* Life of the Land v. Brinegar, *supra*.

104. PPM 90–1, *supra* note 55, ¶ 6.p.(2).

105. Donato Altobelli of the regional office of the FHWA testified as follows during cross examination by plaintiff:

"Q. I would show the witness Plaintiff's Exhibits 36 [*supra* note 27] and 39 [*supra* note 30]. Were these environmental studies submitted to your task force for comment or were comments solicited with respect thereto?

A. No, they were not.

THE COURT: What you are talking about, 39?

[Plaintiff's counsel]: Plaintiff's Exhibit 36 is the noise analysis.

Plaintiff's Exhibit 39 is the air quality study.

THE WITNESS: I might add here that under our procedure these studies were not required. We were aware of them. They were not required. But Mr. Siccardi took the initiative that because of where we were and where we were at, at this time, he asked, and the state was agreeable, to make these studies, over and above what was required by the existing regulations.

Even at the time that the final environmental impact statement, even at the time that he complied with the CEQ guidelines, he was not required to make this air analysis or this noise study by any regulations or guidelines from us, when he took the initiative on his own with the state to decide to look at these things because of improvements.

Q. [By plaintiff's counsel] Would you say that they're purely gratuitous, then?

A. I'd say that they're exemplary of the fact that somebody continued to look at a problem, even though it wasn't required by any federal regulation or state regulation.

Q. If it was not required, may it be ignored by the Federal Highway Administration?

A. . . . .

No, I don't think it should be ignored or was it ignored.

Q. But it was not submitted to the regional office?

A. Because it really was not anything that had to go to the regional office.

Q. Although certain expertise with respect to environmental review exists there?

A. I might add that in the area that you're talking about were two areas that until very recently the regional office did not have expertise.

Q. How recent?

A. Say in the last six to nine months. We've had an extensive training effort to get people on my staff trained in air pollution and noise pollution. I've been sending people to school, civil engineers, to training sessions put on by EPA, put on by the California Highway Department, put on by seminar groups, to get them the expertise." Altobelli testimony, *supra* note 18, Reporter's Transcript of Selected Excerpts at 4–6.

not only the solicitation of comments, but also the attachment of such comments to the EIS itself, which must accompany the proposal through the federal agency's decision making process.

"Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of Title 5, and shall accompany the proposal through the existing agency review processes . . . ." Section 102(2)(C), 42 U.S.C. § 4332(2)(C). The circulation of the draft EIS for inter-agency comments guards against objective errors or excessive bias in an

EIS;[106] the forwarding of the final EIS for intra-agency review guarantees that those ultimately responsible for agency decisions have a factual basis for their review of their subordinates' recommendations.

Had the post-EIS I–291 noise and air quality studies been circulated for comment as a draft supplemental EIS, then under PPM 90–1 they would have been disclosed to the public,[107] thereby changing the entire posture of this case, particularly in regard to laches. See pp. 233, 237, 239–240, supra. In Citizens for Mass Transit, by contrast, the plaintiffs therein were not only aware of the draft supplemental EIS, but were also given the opportunity to comment thereon, and to have their comments included in the final supplemental EIS.[108] Moreover, the circulation for comment of the post-EIS air quality and noise studies as a draft supplemental EIS would have brought I–291 to the attention of the EPA, thereby curing the original EIS of an additional alleged defect secondary to its lack of quantitative detail.[109]

---

106. Only "excessive" bias is impermissible in an EIS, since "The test of compliance with § 102 [of NEPA, 42 U.S.C. § 4332,] . . . is one of good faith objectivity rather than subjective impartiality." Environmental Defense Fund v. Corps of Engineers, supra, 470 F.2d at 296. "The agency itself need not show 'subjective impartiality,' i. e. it can have . . . a mandate to achieve certain goals which conflict with preservation of the environment. . . . In the case of the FHWA . . . that goal is, of course, to build highways. But it must be demonstrated by the agency that with regard to the specific project for which the EIS is prepared, the agency has weighed with 'good faith consideration' the environmental impact of the project and that the agency will modify or drop the project if the environmental costs are sufficient to outweigh the benefits of the project." Conservation Society of Southern Vermont v. Secretary of Transportation, supra, 362 F.Supp. at 633 (emphasis in original).

107. PPM 90–1, Plaintiff's Exhibit 12, supra note 55, ¶ 6.c.

108. See note 103, supra.

109. In addition to its other objections, plaintiff also maintains that the original EIS

is invalid because as a preliminary draft it was not circulated for comment to the EPA. See p. 230, supra. Plaintiff would draw an inference of bad faith on the part of defendants from this circumstance. In fact, the failure to circulate a copy of the preliminary draft EIS to the EPA arose from administrative confusion as to procedures to be followed by state highway authorities in preparing draft EIS's for submission to the FHWA.

The preliminary draft I–291 EIS written by CONNDOT in conjunction with the division office of the FHWA, see p. 239, supra, was prepared by reference to the FHWA's interim guidelines for compliance with NEPA, supra note 56, a copy of which had been forwarded to CONNDOT on December 11, 1970 (see cover letter to George J. Conkling, Commissioner of CONNDOT, Defendants' Exhibit A), and to which CONNDOT's attention had expressly been directed by the FHWA Division Engineer's letter of February 1, 1971, requesting CONNDOT's preparation of an EIS. See p. 239 & note 10, supra. The interim guidelines required circulation of preliminary draft EIS's "to those Federal agencies (in all cases to HUD) with jurisdiction by law or special expertise (Appendix E) on an environmental impact for

Had the post-EIS studies been treated as a supplemental EIS and thus been forwarded for review to the regional office of the FHWA, their data could have been evaluated by the multi-disciplinary task force maintained there purposely to allow a more sophisticated technical review of EIS's than is possible at the division office level. Indeed, just at the time that defendant Siccardi decided unilaterally in June, 1973, that the post-EIS studies warranted no further delay

comment." Interim Guidelines, *supra* note 56, ¶ 6.b. Foremost among Appendix E's listings of agencies with expertise in or jurisdiction over air quality and air pollution control was the National Air Pollution Control Administration, an arm of the Environmental Health Service of the Department of Health, Education and Welfare.

Appendix E's list was taken verbatim from the identical list in the predecessor to the FHWA's interim guidelines, Department of Transportation Order 5610.1, promulgated Oct. 7, 1970, and attached to the interim guidelines as Appendix B. *See* Interim Guidelines, *supra* note 56, ¶ 3.d. Appendix B/DOT Order 5610.1 carefully noted that its "list of Federal agencies with their area of expertise, prepared by the CEQ, . . . should not be presumed to be all-inclusive." Interim Guidelines, *supra* note 56, Appendix B at 6, ¶ 7.e. This caveat was unfortunately not repeated in the reprinting of the list in Appendix E.

The preliminary draft I–291 EIS was accordingly circulated by CONNDOT to the agencies specified in Appendix E, including the National Air Pollution Control Administration. Upon the establishment of the EPA on December 2, 1970, however, the EPA had taken over the functions of the National Air Pollution Control Administration. Reorganization Plan No. 3 of 1970, 84 Stat. 2086, *see* Historical Note, 42 U.S.C.A. at 401 (1973 ed.).

· In the wake of the creation of the EPA, the CEQ issued proposed revisions to its existing guidelines on federal agencies' compliance with NEPA; among the changes made was the listing of the Air Pollution Control Office of the EPA in the place of the National Air Pollution Control Administration as the primary federal agency with special expertise or jurisdiction over air quality. 36 Fed.Reg. 1398 et seq., Jan. 28, 1971. (The fact that the preliminary draft I–291 EIS was sent to the superseded National Air Pollution Control Administration belies the assertion in CONNDOT's chronology of the I–291 EIS preparation process, attached to Plaintiff's Exhibit 25, *supra* note 21, that the preliminary draft I–291 EIS was circulated on June 3, 1971 to a "[l]ist of agencies obtained from Federal Register dated January 28, 1971, in consultation with Area Engineer [a subordinate of the Division Engineer] FHWA." *See also* letter from George H. Hubbard, CONNDOT, to Mrs. Albert Magnoli, a member of plaintiff, Oct. 15, 1973, Plaintiff's Exhibit 48, stating that the Jan. 28, 1971 issue of the Federal Register is "the procedural document upon which the Draft Environmental Statement for Interstate 291 in Newington was based." These erroneous after-the-fact guesses as to the procedure employed in circulating the preliminary draft I–291 EIS are illustrative of the confusion prevalent in advance of the promulgation of PPM 90–1.)

The revised CEQ guidelines were published in final form on April 23, 1971, 36 Fed.Reg. 7725 et seq., but were expressly made applicable only to EIS's circulated after June 30, 1971. Revised CEQ Guidelines, ¶ 3(a), 36 Fed.Reg. 7725. The CEQ revisions are reflected in the final version of the FHWA guidelines on preparation of EIS's, which was circulated on August 24, 1971, as PPM 90–1, *supra* note 55, and which properly lists the EPA as an agency of special expertise and jurisdiction regarding air quality. But circulation of PPM 90–1 occurred nearly three months after completion of the preliminary draft EIS in the instant case.

I find on the basis of these confusing circumstances that the CONNDOT and FHWA personnel who worked on the preliminary EIS were unaware until they received PPM 90–1 of the existence, or at least the significance, of the change in the CEQ guidelines which added the EPA to the list of agencies to be sent EIS's. *See* Siccardi testimony, *supra* note 19. *See also* letter from Edward J. Conley, EPA, to Sherwood T. Bothwell, CONNDOT, December 2, 1971, Defendants' Exhibit B, indicating that as of at least Sept. 8, 1971—after circulation of PPM 90–1—the EPA was receiving preliminary draft EIS's on proposed Interstate Highway projects from CONNDOT.

As it happened, when the regional director of the defunct National Air Pollution Control Administration was reassigned to the EPA on July 1, 1971, he brought the preliminary draft I–291 EIS with him in his files. But since the draft EIS had not been received by the EPA through official channels, no review of it, official or unofficial, was ever undertaken by the EPA. Affidavit of Wallace E. Stickney, Director of the Environmental Impact Office of the EPA, Region I, Dec. 5, 1973, submitted by defendants on Dec. 6, 1973.

in P.S.&E. approval, the regional office to which he is responsible acquired the capability of expert review of such studies.[110]

Prior case law supports the Court's refusal to treat the uncirculated and unreviewed noise and air quality studies as a supplemental EIS possibly curative of the defects in the original EIS. In Natural Resources Defense Council v. Morton, 337 F.Supp. 170 (D.D.C.1972), the court was concerned with a proffered "addendum" or supplement to the EIS which had been declared inadequate by the court in Natural Resources Defense Council v. Morton, 337 F.Supp. 167 (D. D.C.1971), aff'd 458 F.2d 827, *supra.*

"The Court believes that Section 4332(2)(C) of NEPA has not been complied with, since the addendum, which is essentially a draft statement, has not been submitted for comment and review by any other Federal agencies, nor have the comments and views of the 'appropriate Federal, State, and local agencies' been solicited with regard to this addendum. . . . As was explained by Government counsel, the normal procedure is to prepare the Final Impact Statement and to circulate this statement for comment and review by appropriate Federal, State, Local and other interested agencies. In the case at bar the original Final Impact Statement was circulated for comment and review, however, this statement did not contain the proper discussion of the alternatives as is required by NEPA. Following the decision of the Court of Appeals, the addendum, which included the required discussion of alternatives, was pre-

pared by the Department of Interior. This addendum has to date never been circulated to other Federal agencies, nor has it been sent to the appropriate State and local agencies or other parties who might be interested in the proposed lease sale. If this addendum is to be considered a part of the Final Impact Statement, then it must be subjected to the same comment and review procedures outlined by Section 4332(2)(C) of NEPA, as was required for the original Final Impact Statement which did not contain the addendum when it was first circulated.

. . . While it is quite conceivable that none of the alternatives . . . are feasible at this time, this fact does not mean that those Federal, State and local agencies interested should not be given the opportunity to comment on the Addendum to the Final Impact Statement as required by Congress. Whether or not the comments will be valuable in the end is not the question before this Court. The Court must only determine whether the opportunity for comment as required by Section 4332(2)(C) was afforded. The Court finds that the opportunity was not afforded in this instance with respect to the addendum, which was an important part of the Final Impact Statement." National Resources Defense Council v. Morton, *supra,* 337 F.Supp. at 172–173.[111]

*Compliance with Substantive Duties*

■ The final contention of plaintiff which bears discussion is that irre-

---

110. Mr. Altobelli of the FHWA's regional office testified on Nov. 28, 1973, that his multi-disciplinary EIS review team had acquired expertise in air pollution and noise pollution "Say in the last six to nine months." *See* note 105, *supra.* The post-EIS noise study was submitted to defendant Siccardi on March 6, 1973, *see* p. 231, *supra* —less than nine months before Mr. Altobelli's testimony. The post-EIS air quality study was submitted to defendant Siccardi on June 8, 1973, *see* p. 231, *supra*—less

than six months before Mr. Altobelli's testimony.

111. *Cf.* Environmental Defense Fund v. Froehlke, 368 F.Supp. 231 (W.D.Mo.1973), in which the court refused to order circulation of a supplemental EIS on the basis of its conclusion (albeit reached in part through its consideration of "the additions and amplifications contained in the Supplement to the final EIS") that "the final EIS is [itself] adequate under the circumstances of this case." At 237, 243.

spective of the procedural adequacy of the I–291 EIS and the subsequent noise and air quality studies, defendants have violated their substantive duties under NEPA by proceeding with I–291 despite the evidence in the post-EIS studies that I–291 would result in significant deterioration of the present air quality and noise levels in areas adjacent to the proposed route of I–291. Plaintiff claims that defendants' "continuing responsibility . . . to use all practicable means, consistent with other essential considerations of national policy, to improve and coordinate Federal plans, functions, programs and resources to the end that the Nation may . . . attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences," section 101(b)(3) of NEPA, 42 U.S.C. § 4331(b)(3), required them to forego construction of I–291 absent modifications to mitigate the adverse impacts revealed by the post-EIS studies.

In light of the Court's conclusion that defendants appear to have failed to comply in several respects with NEPA's procedural requirements, plaintiff's substantive claim could properly be disregarded. However, since the issue may arise again in further proceedings before the Court, the interests of justice will better be served by at this time giving the parties the benefit of the Court's views on the matter.

The air quality study predicted the amounts of three pollutants which will be present at selected "receptor points" along I–291 in 1990 during "worst-case" conditions of stagnant air and 8–9 a. m. rush-hour traffic and during "normal-case" conditions of more dispersive wind and the relatively light traffic of the 1–2 p. m. noonday rush hour.[112] The study found that even under "worst-case" conditions federal air quality standards for carbon monoxide (CO) will not be approached, let alone exceeded, at any of the 14 receptor points.[113] Federal standards for nitrogen dioxide ($NO_2$) will also not be exceeded.[114] However, I–291 alone will generate between 20 and 70 per cent of the $NO_2$ allowed under federal standards at nine of the 14 receptor points.[115] In addition, at four of these nine receptor points, existing stationary sources of pollution can be expected to add another 20 per cent of the total $NO_2$ allowed under federal standards.[116] At two of these four critical points, the combined emissions of $NO_2$ by present sources and I–291 traffic in 1990 will result in $NO_2$ concentrations reaching 90 per cent of that allowed under federal standards.[117] The air quality study concluded from these figures that "the proposed Route I–291 traffic emissions of nitrogen oxide use much of the air resource in many areas immediately adjacent to the highway. Thus, land use development and commerce, which through combustion of large quantities of fuel would also be large emitters of $NO_2$, should be discouraged in these areas along the highway, since there is little remaining 'air resource.' The air resources are almost all 'committed' to highway use in those areas up to 400 feet from the highway."[118]

The study also found problems with hydrocarbon (HC) levels. At three of the 14 receptor points federal standards will be exceeded during "worst-case"

---

112. Air Quality Study. Plaintiff's Exhibit 39, *supra* note 30, at 2, 23.

113. *Id.* at 30, 41–44.

114. *Id.* at 30, 39, 43–44. Since federal $NO_2$ standards are expressed in annual averages, only a "normal case" average was predicted by the study. *Id.* at 39, 44.

115. See the figures listed in Table 5, *id.* at 43.

116. Id. at 45.

117. *Compare* the figures for $NO_2$ emissions by stationary sources, *supra* note 116, with the projected emissions of traffic along I–291, as listed in Table 5, *supra* note 115.

118. Air Quality Study, Plaintiff's Exhibit 39, *supra* note 30, at 47.

conditions.[119] These points, located respectively 200, 450, and 300 feet from the highway, can be expected to have "worst-case" meteorological conditions respectively 9.0, 2.5, and 9.0 per cent of the time.[120] However, the actual incidence of "worst-case" pollution will be "somewhat" lower since "[t]here is no indication, other than the usual diurnal wind patterns for Connecticut, that worst case meteorology always coincides with the heaviest traffic load."[121] Since HC (as well as CO) emissions "from stationary sources are negligible along the proposed route," the projected HC pollution problem is not expected to be aggravated by non-automotive emissions.[122]

The noise study found that noise created by projected 1990 traffic on I–291 will exceed FHWA standards at two of 21 receptor points. One of these points lies near the junction of I–291 and I–91; the study suggested that should I–291 not be built the point would experience much the same noise from the increased traffic which I–91 would bear in the absence of I–291.[123] The other point where FHWA standards will be exceeded by noise from I–291 is located in the Eagle Lantern Village open space area of Newington.[124] Construction of a sound barrier was recommended for this area. See p. 231 & note 28, supra. At 18 out of the total of 21 receptor points, the noise to be created by I–291 alone will exceed the present ambient noise levels.[125] The study made no attempt to estimate what noise level will be created at the receptor points by the combination of the projected noise from I–291 and noise from sources other than I–291.[126]

The noise and air pollution problems broached in the post-EIS studies are certainly significant. But they appear to be nowhere near so drastic as to permit the Court to conclude, under the narrow standard of substantive review previously discussed, see pp. 240–242, supra, that defendants' decision to proceed with construction of I–291 was arbitrary or capricious. Moreover, although plaintiff produced expert testimony attacking the methodology of the air and noise pollution studies, plaintiff produced no empirical evidence of its own that the noise and air pollution impacts of I–291 would be even greater than the post-EIS studies suggested. I accordingly conclude that there is no reasonable probability that plaintiff would prevail at a trial on the merits of its substantive claim under section 101(b)(3) of NEPA, 42 U.S.C. § 4331(b)(3).

V.

CONCLUSION

The familiar principles governing the granting of a preliminary injunction have been succinctly summarized by Professor Moore. "[I]n actions in which only private interests are involved the trial court may, in the exercise of its discretion, properly grant an interlocutory injunction when it is satisfied that there is a probable right and a probable danger and that the right may be defeated, unless the injunction is issued; that the plaintiff is in substantial need of protection; and that the damage to him, if the injunction is denied, plainly outweighs any foreseeable harm to the defendant." 7 J. Moore, Federal Practice ¶ 65.04[1], at 65–39 (2d Ed.1973). However, these principles are qualified by the policy that "Courts of equity may, and frequently do, go much farther both to give and withhold relief in furtherance of the public interest than they are accustomed to go when only private interests are involved." Virginian Ry.

---

119. Id. at 30, 42, 44.

120. Id. at 42, 44–45.

121. Id. at 41.

122. Id. at 45.

123. Noise Analysis, Plaintiff's Exhibit 36, supra note 27, at 2.

124. Id.

125. Id. at Fig. 2.

126. Id. at 2.

Co. v. System Federation, 300 U.S. 515, 552, 57 S.Ct. 592, 601, 81 L.Ed. 789 (1937). Thus equitable doctrines conditioning injunctive relief on a balancing of equities "do not militate against the capacity of a court of equity as a proper forum in which to make a declared policy of Congress effective." United States v. City and County of San Francisco, 310 U.S. 16, 31, 60 S.Ct. 749, 757, 84 L.Ed. 1050 (1940). NEPA is clearly a declaration of Congressional policy which depends greatly for its effectiveness on judicial enforcement through injunctive relief. Lathan v. Volpe, 455 F. 2d 1111, 1116–1117 (9th Cir. 1971). *Accord,* Environmental Defense Fund v. Tennessee Valley Auth., 468 F.2d 1164, 1183–1184 (6th Cir. 1972). As has been said in an FHWA-NEPA case, "unless the plaintiffs receive *now* whatever relief they are entitled to, there is danger that it will be of little or no value to them or anyone else when finally obtained." Lathan v. Volpe, supra, 455 F. 2d at 1117 (emphasis in original). See also Environmental Defense Fund, Inc. v. Froehlke, 477 F.2d 1033, 1037 (8th Cir. 1973): "We recognize that the injunction is the vehicle through which the congressional policy behind NEPA can be effectuated, and that a violation of NEPA in itself may constitute a sufficient demonstration of irreparable harm to entitle a plaintiff to blanket injunctive relief."

■■■ Of course, the fact that important public policies are at stake when it appears that an expressway is being constructed in violation of NEPA does not preclude altogether the Court's balancing of the equities in deciding upon an application for injunctive relief. But the foregoing cases do establish that where injunctive relief as a remedy for non-compliance with NEPA is in issue, "the burden should be upon those urging that non-compliance should be excused." Committee to Stop Route 7 v. Volpe, *supra,* 346 F.Supp. at 738.

■ Under this standard, if "construction were now nearly completed, the equities would not favor an injunction." *Id.* While construction of the initial two-mile segment of I–291 west from I–91 has been underway since September, 1973, it was still in the preliminary stage at the time of the hearing on plaintiff's motion for a preliminary injunction. Presumably it has progressed further since that hearing, but even assuming, *arguendo,* that post-hearing construction should be considered in balancing the equities, it does not appear that construction of even the initial segment of I–291 is anywhere near complete.

While considerable expense will indeed be involved in halting work on I–291, it is better for this expense to be incurred in serving NEPA than to risk the illegal expenditure, in contravention of NEPA, of much more substantial sums. Moreover, the point of injunctive relief is to preserve realistic options for federal decision makers, including the option of abandonment of the project. Defendants are not entitled to assume that full compliance with NEPA "will have no effect whatever on the decision whether or not to build." Committee to Stop Route 7 v. Volpe, *supra,* 346 F.Supp. at 738– 739. It is cheaper to halt construction now and proceed later, if this is decided upon, than to continue to construct even more of a project which may ultimately be abandoned and perhaps even dismantled. Thus I must agree with the position taken by Chief Judge Reynolds in the analogous case of Northside Tenants' Rights Coalition v. Volpe, 346 F. Supp. 244, 249 (E.D.Wis.1972):

"I have found above that there is a substantial probability that NEPA is applicable to the freeway at issue here today. And 'It is far more consistent with the purposes of the Act to delay operation at a stage where real environmental protection may come about than at a stage where corrective action may be so costly as to be impossible.' Calvert Cliffs' Coordinating Committee v. United States Atomic Energy Commission, 146 U.S.App.D.C. 33, 449 F.2d 1109, 1128 (1971). Fail-

ure to grant a preliminary injunction at this time would allow further investment of resources into Park Freeway-West, making its abandonment or alteration in light of environmental concerns increasingly costly and increasingly difficult. Indeed it might even cost plaintiffs their case, for if construction continues it might well reach the stage where NEPA would be inapplicable. See Arlington Coalition v. Volpe, 458 F.2d 1323, (4th Cir. 1972)."

Finally, I turn to the assertion of the *amicus* that a cessation of construction will probably result in a loss of jobs. There has been no showing, however, of the extent to which alternative employment is unavailable to those currently employed on I–291. In any case, Congress passed NEPA despite that body's acute sensitivity to legislation productive of economic dislocation. Nothing in NEPA authorizes according the environment any less solicitude than employment. Where, as here, the impact of an injunction on individuals' employment is far less severe than the impact of a denial of an injunction on the environment, the Congressional value judgment must be honored.

The Court's jurisdiction over this action under 28 U.S.C. § 1331 has not been disputed, and the Court concludes that it has such jurisdiction. For the reasons recited in the foregoing opinion, which shall serve as the Court's findings of fact and conclusions of law, Fed.R.Civ.P. 52(a), a preliminary injunction shall issue enjoining defendants, their officers, agents, servants, employees, and attorneys from any further acts or expenditures for the construction of I–291 until further order of the Court.

A nominal bond being appropriate compliance in these circumstances with Fed.R.Civ.P. 65(c), see Sierra Club v. Froehlke, *supra*, 359 F.Supp. at 1385 & n. 452, plaintiff shall post security in the amount of $100. The Court will entertain a motion to dissolve the injunction (1) after trial on the merits of plaintiff's complaint; or (2) upon presentation to the Court, after filing with the CEQ, of a revised final EIS prepared in conformity with this opinion.

So ordered.